1  MICHAEL E. KINNEY
   California Bar No. 77018
2  LAW OFFICE OF MICHAEL E. KINNEY
   438 First St.
3  Fourth Floor
   Santa Rosa, CA  95401
4  (707) 527-4141
   Fax (707) 579-9561
5  email: kinney@kinnlaw.com

6  Attorney for Plaintiff
   DONALD GRACEY

7

8                    UNITED STATES DISTRICT COURT

9                   NORTHERN DISTRICT OF CALIFORNIA

10

11                                       No.   C 07-03853  VRW

12 DONALD GRACEY,                        PLAINTIFF'S OPPOSITION TO
                                         DEFENDANT'S MOTION FOR
         Plaintiff,                      SUMMARY JUDGMENT
13
   vs.                                   [Filed Concurrently with Declaration
14                                       of Michael E. Kinney; Declaration of
   KAISER PERMANENTE FLEXIBLE            Donald Gracey; Evidentiary
15 BENEFITS PLAN,                        Objections and Request for Judicial
                                         Notice]
16         Defendant.
   _____/     Date:   March 27, 2008
17                                       Time:  2:30 p.m.
                                         Ctrm:  6
18

19

20

21

22         COMES NOW PLAINTIFF, DONALD GRACEY, and, hereby opposes Defendant's

23 Motion for Summary Judgment.

24

25

26

27

28

# TABLE OF CONTENTS

I.      INTRODUCTORY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    1

II.     THIS IS AN "OWN OCCUPATION" LONG TERM DISABILITY INSURANCE
        POLICY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    2

III.    PLAINTIFF IS DISABLED FROM HIS STRESSFUL OCCUPATION . . . . . . . . .    2

        A. Plaintiff Suffers from Multiple Disabling Medical Problems.. . . . . . . . . . . . . . .    2

        B. Stress Is an Element of Plaintiff's Occupation. . . . . . . . . . . . . . . . . . . . . . . . . .    2

        C. The Stress of Plaintiff's Employment Is Disabling. . . . . . . . . . . . . . . . . . . . . . .    3

IV.     METLIFE IGNORED PLAINTIFF'S INABILITY TO DEAL WITH STRESS. . . .    5

        A. The Effect of Stress Was a Central Element of the Claim . . . . . . . . . . . . . . . . . .    5

        B. Metlife Completely Ignored the Effects of Stress on Plaintiff's Health. . . . . . . . .    5

V.      BY OVERLY COMPARTMENTALIZING ITS PHYSICIAN REVIEWS, METLIFE
        HAS FAILED TO CONSIDER PLAINTIFF'S CONDITION AS A WHOLE.. . . . .    10

VI.     THE COURT SHOULD APPLY THE DE NOVO STANDARD OF REVIEW
        BECAUSE DISCRETIONARY AUTHORITY WAS NOT DELEGATED TO
        METLIFE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    10

        A. The De Novo Standard Applies Here. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    10

        B. It Is Appropriate For the Court to Grant Judgment for Plaintiff under the De Novo
           Standard. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    13

VII.    IF THE COURT DECLINES TO EMPLOY THE DE NOVO STANDARD, IT MUST
        EMPLOY GREAT SKEPTICISM AS DIRECTED BY ABATIE AND SAFFON. .    14

VIII.   IF THE ABATIE STANDARD APPLIES, SUMMARY JUDGMENT IS NOT
        PROPER AND PLAINTIFF IS ENTITLED TO DISCOVERY . . . . . . . . . . . . . . .    17

IX.     THE COURT SHOULD ALLOW PLAINTIFF TO CONDUCT A FULL RANGE OF
        DISCOVERY ON ALL OF THE ISSUES SUGGESTED BY ABATIE. . . . . . . . .    19

X.      CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    22

# TABLE OF AUTHORITIES

**CASES**

Abatie v. Alta Health & Life Ins. Co.,
458 F.3d 955 (9th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 15, 17, 18, 19

Allen v. Woodford,
2007 U.S. Dist. LEXIS 11002  (E.D. Cal. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . 19

Baldoni v. Unumprovident,
2007 U.S. Dist. LEXIS 14127 (D. Or. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Beckstrand v. Electronic Arts Group Long Term Disability Ins. Plan,
2007 U.S. Dist. LEXIS 43643, *15 (E.D. Cal. 2007) . . . . . . . . . . . . . . . . . . . . . . 18

Black & Decker Disability Plan v. Nord,
538 U.S. 822, 834, 834, 123 S. Ct. 1965, 155 L. Ed. 2d 1034 (2003) . . . . . . . . . 9

Boyles v. Unum Life Ins. Co. of Am.,
2006 U.S. Dist. LEXIS 88581, *18 (C.D. Cal. 2006) . . . . . . . . . . . . . . . . . . . . . . 14

Booton v. Lockheed Medical Benefit Plan,
110 F.3d 1461, 1463 (9th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Bradley v. Bowen,
800 F.2d 760, 762 (8th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Clark v. Bowen,
668 F. Supp. 1357, 1360, (N.D. Cal 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Cool Fuel, Inc. v. Connett,
685 F.2d 309, 311 (9th Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Empire Fire and Marine Insurance Co. v. Bell,
55 Cal. App. 4th 1410 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Firestone Tire & Rubber Co. v. Bruch,
489 U.S. 101, 115 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Groom v. Standard Ins. Co.,
492 F. Supp. 1202, 1204-05 (C.D. Cal. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Gullidge v. Hartford Life & Acc. Ins. Co.,
501 F. Supp; 2d 1280, 1283 (C.D. Cal. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . 18

Harper v. Unum Life Ins. Co. of America,
2007 U.S. Dist. LEXIS 47533, *9-12 (E.D. Cal. 2007) . . . . . . . . . . . . . . . . . . . . . 18

Kalish v. Liberty Mutual,
419 F.3d 501, 506, (5th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Kearney v. Standard Ins. Co.,
175 F. 3d 1084, 1090 (9th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Linich v. Broadspire Services, Inc.,*
        2007 U.S. Dist. LEXIS 19295, at *17 (D. Ariz. 2007) . . . . . . . . . . . . . . . . . . . . . .     18

*Liu v. Standard Ins. Co.,*
        457 F. Supp. 2d 1030, 1038 (C.D. Cal 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     18

*McCurdy v. Metropolitan Life Ins. Co.,*
        2007 U.S. Dist. LEXIS 25917, *5 (E.D. Cal 2007) . . . . . . . . . . . . . . . . . . . . . . .     18

*Oakes v. Halvorsen Marine Ltd.,*
        179 F.R.D 281, 283 (C.D. Cal. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     19

*Riedl v. General Am. Life Ins. Co.,*
        248 F.3d 753, 759 n.4 (8th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     14

*Rodriguez-Abreu v. Chase Manhattan Bank, N.A.,*
        986 F.2d 580, 585 (1st Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     13

*Saffon v. Wells Fargo & Co. Long Term Disability Plan,*
        511 F.3d 1206, 2008 U.S. App. LEXIS 334,  (9th Cir. 2008) . . . . . . . .     6, 12, 13, 16, 17

*Shane v. Albertson's Inc.,*
        504 F.3d 1166 (9th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     13

*Sterio v. Highmark Life Ins. Co.*
        2007 U.S. Dist. LEXIS 54035  (E.D. Cal. 2007) . . . . . . . . . . . . . . . . . . . . . . . . .     18

*Stewart v. Heckler,*
        730 F.2d 1065, 1066-67 (6th Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     3

*Toven v. Metropolitan Life Ins. Co.,*
        517 F. Supp. 2d 1174 (.D. Cal. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     18

*Tremain v. Bell Industries, Inc.*
        196 F.3d 970, 976-77 (9th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     18

*Welch v. Metropolitan Life Ins. Co.,*
        490 F.3d 942 (9th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 18

**STATUTES**

 29 USC § 1132(a), (e), (f) and (g) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     1

1
2

## MEMORANDUM OF POINTS AND AUTHORITIES

3
4

## I.

5

## INTRODUCTORY STATEMENT

6

This is a Long Term Disability Insurance case in which Plaintiff Donald Gracey seeks

7

benefits that were denied to him by Metropolitan Life Insurance Company ("MetLife"), the insurer

8

of benefits under the Kaiser Permanente Flexible Benefits Plan.  This action was brought under 29

9

USC § 1132(a), (e), (f) and (g) of the Employee Retirement Income Security Act of 1974

10

("ERISA") as it involves a claim by Plaintiff for employee benefits under an employee benefit plan

11

regulated and governed under ERISA.

12

Prior to becoming disabled, Plaintiff worked for Kaiser Foundation Health Plan, Inc.

13

as a Construction Project Manager.  This position regularly placed Plaintiff in high stress

14

situations.  Plaintiff has a history of multiple medical problems, especially heart problems.  His

15

medical history includes congestive heart failure, coronary artery disease, angina, hypertension,

16

dilated cardiomyopathy, and hyperlipidemia.  He had bypass surgery followed by repeat cardiac

17

catheterization.  In addition, he has been diagnosed with diabetes, depression, severe headaches,

18

sleep apnea and a seizure disorder.

19

The stress of Plaintiff's job exacerbated his medical problems, especially his heart

20

problems.  In January 2006, Plaintiff went to the emergency room with chest pains, and was

21

subsequently unable to work at his high stress occupation.

22

Plaintiff duly applied for long term disability insurance benefits.  MetLife, the

23

insurer, handles all aspects of claims made under the Plan.  MetLife denied the claim, completely

24

ignoring the element of stress in Plaintiff's job.  Plaintiff appealed and provided substantial

25

documentation demonstrating that his health does not permit him to work in a high stress

26

environment.  MetLife denied the appeal, again giving no consideration whatsoever to the impact

27

of job stress on Plaintiff's condition.

28

This lawsuit followed.

## II.

## THIS IS AN "OWN OCCUPATION" LONG TERM DISABILITY INSURANCE POLICY

In order to qualify for long term disability insurance benefits, plaintiff must be disabled from the duties of his own occupation. Although Defendant has not submitted an insurance policy, it has provided a Summary Plan Description ("SPD"), which sets out the definition of disability as follows in relevant part:

> "You are considered disabled if:
>
> During your elimination period . . . and the next 24-month period, you are unable to earn more than 80% of your pre-disability earnings at your own occupation for any employer in your local economy."

(Admin 0907[1]).

## III.

## PLAINTIFF IS DISABLED FROM HIS STRESSFUL OCCUPATION

### A.     Plaintiff Suffers from Multiple Disabling Medical Problems.

Plaintiff is a 54 year old man who suffers from multiple medical problems, including atherosclerotic coronary artery disease, cardiomyopathy, hypertension, diabetes mellitus (type II), hypercholesterolemia, and sleep apnea (Admin 0288), a seizure disorder (Admin 0270), depression (Admin 0765), and fatigue as a side effect of his medications (Admin 0118). As discussed in some detail below, the doctors who have examined Mr. Gracey agree that he is disabled from performing the duties of his occupation.

### B.     Stress Is an Element of Plaintiff's Occupation.

Stress is clearly an element of Plaintiff's occupation. MetLife's file is replete with references to stress in Plaintiff's occupation. For example, MetLife's log entry found at Admin 0052, lists "frequent stressful situations" as an element of Plaintiff's job description. The Disability Claim Supervisor's Statement of May 2, 2006, filled out by Plaintiff's employer (Admin 0790) indicates that stressful situations occupy up to 33% of Plaintiff's time. The clearest overall

---

[1]     Referencing the bates stamped pages from the documents produced by Defendant and filed with the Court.

description of the stressful situations inherent in Plaintiff's occupation is found in Plaintiff's Declaration, submitted to MetLife in connection with his administrative appeal, Admin 0265 through 0269. In it, Plaintiff explains in detail that the stress engendered by his occupation is intense and fairly constant. He lists numerous conflict situations that are endemic to the occupation of Construction Project Manager, and describes the need to engage in constant multi-tasking, the substantial time and cost constraints, the problematic relations with regulators, the competing interests of department heads, the role of construction project manager to be bearer of bad news, and the need to travel regularly to multiple cities where construction projects are underway. It is easy to understand that stress of this nature can have adverse health consequences, particularly given the multiple health problems from which plaintiff suffers.

**C.      The Stress of Plaintiff's Employment Is Disabling**.

Under ERISA, a claimant is considered disabled from his own occupation if he is unable to handle the stress of his occupation, even if he is otherwise able to perform sedentary work. Kalish v. Liberty Mutual, 419 F.3d 501, 506, (5th Cir. 2004). Numerous courts have determined that claimants with heart disease may be effectively disabled by the effect of stress. See, e.g., Clark v. Bowen, 668 F. Supp. 1357, 1360, (N.D. Cal 1987); Bradley v. Bowen, 800 F.2d 760, 762 (8th Cir. 1986); Stewart v. Heckler, 730 F.2d 1065, 1066-67 (6th Cir. 1984).

Plaintiff was unable to continue working because the stress of his occupation affected his health. MetLife's file contains numerous references to the adverse effects of occupational stress on Plaintiff. For example, Plaintiff's treating physician Dr. Hlavac noted the negative effect of stress in various office notes, Admin 0773 and Admin 0234. Dr. Hlavac made his opinion on this point eminently clear in three reports. On August 7, 2006, Dr. Hlavac wrote:

> "Mr. Gracey is unable to work as a project manager for any company or corporation due to stress and the effect that it has on his chronic conditions."

Admin 0723.

On February 26, 2007, Dr. Hlavac wrote a second opinion letter. On this occasion he said:

> "It is clear that the physical demands and stress from his current

1    occupation were exacerbating these chronic conditions by causing increased angina

2    problems and causing his diabetes to be difficult to control."

3    Admin 0270.

4    Finally, on June 7, 2007, Dr. Hlavac wrote a third opinion letter.  This time, he

5    wrote:

6        "His episodes of angina are made worse by his current line of work and

7    make it unrealistic to function with the stresses of a project manager."

8    Admin 0118.

9    In addition to Dr. Hlavac, Plaintiff was seen by Dr. Samuel Sobol, a board certified

10   cardiologist associated with the medical school at the University of California San Francisco.  Dr.

11   Sobol wrote a lengthy report dated January 23, 2007, (beginning at Admin 0271) in which he

12   discussed the impact on Plaintiff of the stress at work at some length (see p. 19-23 of his report at

13   Admin 0289-0293). For example, he writes:

14       "In view of the patient's poorly controlled blood pressure when he was at

15   work and markedly improved blood pressure at the present time, as well as the relief

16   from the multiplicity of demands and anger-inducing situations which were a recurrent

17   element of his work, it would appear obvious that factors of his employment were

18   contributing to the sum total of risk factors which would have the capacity to

19   aggravate and accelerate his underlying artherosclerotic coronary artery disease. Given

20   the extent and severity of his coronary artery disease, and the necessity of optimally

21   modifying his multiple risk factors to prevent progression of the disease, and the

22   recurrent symptoms he was experiencing, it is evident that removal from the

23   workplace was appropriate."

24   Id. at Admin 0289.

25   Dr. Sobol also discusses the fact that Plaintiff's inability to take beta blockers further

26   militates against allowing him to undergo stress.  Dr. Sobol reviews the current medical literature

27   on the relationship between stress and the sort of cardiovascular disease Plaintiff has, explaining

28   that medical science confirms the common understanding that stress is a seriously exacerbating

1    condition.  Dr. Sobol concludes that the stress of Plaintiff's occupation makes it impossible for

2    Plaintiff to continue working.

### IV.

### METLIFE IGNORED PLAINTIFF'S INABILITY TO DEAL WITH STRESS.

A.              The Effect of Stress Was a Central Element of the Claim.

6            MetLife's files could not be more clear that the stress of Plaintiff's employment was

7    the central reason why he could not work.  MetLife was informed over and over again that

8    Plaintiff could not work due to the adverse health effects of stress.  For example, Plaintiff's

9    original attorney, Rhonda Savitch, wrote to MetLife on October 5, 2006, noting that Plaintiff "was

10   incapable of even 'low stress' jobs."  See, Admin 0477.  Subsequent counsel also wrote to

11   MetLife, and discussed the fact that the stress of Plaintiff's occupation made it impossible to

12   continue working.  Admin 0262.  Of course, all of the medical documentation discussed above

13   appears in the MetLife's files.  No one who looked at that documentation could mistake the fact

14   that the stress of Plaintiff's employment was at the center of this claim.

B.              Metlife Completely Ignored the Effects of Stress on Plaintiff's Health.

16           MetLife has handled this claim as though Plaintiff's employment were completely

17   stress free.  It has utterly ignored the importance of stress here, and acted as though the only

18   consideration in evaluating this claim is how long Plaintiff could sit or stand or walk in a stress-

19   free job.

20           MetLife's initial denial of Plaintiff's claim is so inarticulate as to be

21   incomprehensible. Consider the following paragraph:

22                   "As the objective medical in your claim fails to support your subjective

23                   claims of coronary artherosclerosis, sleep disturbances and high blood pressure, to the

24                   extend as to preclude you from performing the functions of your job as a Project

25                   Manager for any employer in your community, from your date last worked forward,

26                   your claim is denied."(sic)

27           Admin 0730.

28           How one can have "subjective complaints" of coronary artherosclerosis, sleep

1    disturbances and high blood pressure is a mystery.  A denial letter of this sort is defective as a

2    matter of law.   Saffon v. Wells Fargo & Co. Long Term Disability Plan, 511 F.3d 1206, 2008

3    U.S. App. LEXIS 334, *9-11 (9th Cir. 2008). Further, Plaintiff's medical records are full of

4    objective evidence of his conditions, including bypass surgery and repeat cardiac catheterization.

5    In any event, the initial denial letter makes no pretense of considering the stress of Plaintiff's

6    employment or the effect of that stress on his medical conditions.

7            Following MetLife's initial denial letter, Plaintiff submitted a substantial amount of

8    medical records documenting the long history of his conditions.  Once again, Metlife responded

9    that "your claim fails to support your subjective claims of coronary artherosclerosis, sleep

10   disturbances and high blood pressure."  Admin 0347.  MetLife still made no effort to ascertain the

11   level of stress in Plaintiff's occupation or the impact of that stress on Plaintiff's health.

12           MetLife never had Plaintiff's records reviewed by a physician until after Plaintiff filed

13   his administrative appeal.  Finally, on April 30, 2007, MetLife determined that it was advisable to

14   obtain physician review of Plaintiff's medical records.  MetLife's internal notes on that date

15   indicate that the MetLife claims adjuster wanted to make a referral to "Cardiologist/IM and

16   Neurologist."  The adjuster's threshold question was:

17           "Does the medical information support functional limitations for the

18           period in question?  Functional limitations include any reduction in ability to work full

19           time."

20   Admin 0082.

21           MetLife then hired NMR to provide physician reviews.  NMR is a company that

22   provides medical reviews for insurance companies.  In 2005, MetLife referred 3,209 claims to

23   NMR for review and paid NMR $2,063,890.  In the first eight months of 2006, MetLife referred

24   3,360 claims to NMR for review and paid NMR $2,102,535.  See, Exhibit J at 4:4-12 to the

25   Declaration of Lissa A. Martinez (attached to the Request for Judicial Notice as Exhibit C).  Thus,

26   it is clear that NMR has a close relationship with MetLife that can best be nurtured by providing

27   MetLife with reports that support MetLife's denial of claims.  It is also clear that MetLife is not

28   paying very much per medical review.  In 2005, MetLife paid about $643 per claim review.  In

1    2006, it paid about $625 per claim review.  It is safe to say that, for that price, MetLife is

2    obtaining superficial reviews in cases (like this one) with thick files.

3                    When MetLife sent the matter to NMR, it changed the language of its request.  First,

4    it made a change to the threshold question as follows:  "Does the medical information support

5    functional limitations for beyond 7/17/06 (light work)?"  See, Admin 0147.  Additionally,

6    MetLifes's transmittal contained the following language:

7                    "Please define the claimant's current level of functionality based on your

8                    review of all material provided, medical documentation and/or physical examination

9                    **according to DOT physical demands.**"

10                   Id. at p. 0146. [Emphasis added.]

11                   The DOT lists the physical demands for the job category Project Manager as

12   "Sedentary."  Sedentary is defined as follows:

13                   "Exerting up to 10 pounds of force occasionally (Occasionally: activity or

14                   condition exists up to 1/3 of the time) and/or a negligible amount of force frequently

15                   (Frequently: activity or condition exists from 1/3 to 2/3 of the time) to lift, carry,

16                   push, pull, or otherwise move objects, including the human body. Sedentary work

17                   involves sitting most of the time, but may involve walking or standing for brief

18                   periods of time. Jobs are sedentary if walking and standing are required only

19                   occasionally and all other sedentary criteria are met."

20                   The Dictionary of Occupational Titles is online at www.oalj.dol.gov/LIBDOT.HTM

21                   If a doctor limits his opinion to the DOT physical demands, he need not consider the

22   impact of occupational stress on the patient's condition.  MetLife's use of the term "light work"

23   also seems to convey an interest in knowing whether Plaintiff can do minimal lifting and similar

24   physical tasks.  MetLife did not tell the doctors to evaluate the impact of job stress on Plaintiff's

25   condition, even though that was central to the claim.

26                   NMR then selected Hitesh Patel, M.D., to provide a cardiological review.  Dr. Patel

27   is a young doctor who is currently studying to be a cardiologist at Temple University.  MetLife has

28   provided Dr. Patel's resume, which is understandably brief, given that he just completed his

1    residency in 2002.  A copy of Dr. Patel's resume is attached to the Declaration of Michael E.

2    Kinney as Exhibit F.  Defendant has not presented any additional evidence as to Dr. Patel's

3    qualifications and it is unclear whether Dr. Patel had ever reviewed a disability claim before.

4    Given his brief career it is more than possible that this was his first one.  His report, Admin 0134,

5    was prepared on May 8, 2007, just a week after MetLife sent documents to NMR.  His report

6    recites that he was provided some 520 pages of materials.  It is unclear exactly what was in those

7    materials, but it is obvious that Dr. Patel never saw either Mr. Gracey's Declaration or a job

8    description.  Dr. Patel makes no reference whatsoever to Plaintiff's job duties or the stress of his

9    occupation. Dr. Patel's entire discussion of Plaintiff's job duties is the following sentence:

10            "The patient is a 53 year old male who works as a project manager of a

11            project in the Kaiser Permanente from April of 2004 to at the present time." (sic)

12            Admin 0135.

13            It is obvious from Dr. Patel's report that he thought his assignment was to determine

14   whether Plaintiff's cardiological condition precluded Plaintiff from performing the physical tasks of

15   sedentary work.  When Dr. Patel restates the question that he thought MetLife posed, he only

16   restated the form question which was limited to DOT physical demands.  He makes no mention of,

17   and clearly gave no consideration to, the stresses inherent in Plaintiff's occupation and the effect of

18   those stresses on Plaintiff's health.  He completely missed the point.

19            It also appears that Dr. Patel was not provided with Dr. Sobol's lengthy report.  Dr.

20   Patel makes no mention of Dr. Sobol's analysis of the effects of job stress on Plaintiff's condition

21   or Dr. Sobol's review of the literature on unstable angina and the effects of stress.  Certainly, if

22   Dr. Patel had read Dr. Sobol's report, he would have said so and he would have addressed the

23   points raised by Dr. Sobol.  The absence of any discussion of Dr. Sobol's report leads to the

24   inference that Dr. Patel never saw it.

25            Following Dr. Patel's report of May 8, 2007, Plaintiff's treating physician, Dr.

26   Hlavac, sent his report of June 7, 2007 (Admin 0118).  This report was forwarded to Dr. Patel,

27   who prepared a response dated June 27, 2007 (Admin 0112).  Although Dr. Hlavac wrote that

28   Plaintiff's "episodes of angina are made worse by his current line of work and make it **unrealistic**

1   **to function with the stresses** of a project manager," Dr. Patel failed to grasp Dr. Hlavac's

2   meaning and, instead, restated Dr. Hlavac's language to read: "episodes of angina made worse by

3   his current line of work and **realistic functional distress as** a project manager." This is not a

4   mistake that Dr. Patel could have made if he understood that the stress of Plaintiff's occupation

5   was central to his claim of disability. It is clear that Dr. Patel never considered Plaintiff's

6   occupational stresses.

7          It is also noteworthy that Dr. Patel's last report appears to rely on two facts to reach

8   the conclusion that Plaintiff is not disabled. First, Dr. Patel notes that Plaintiff had not suffered

9   further attacks in 2007. Of course, if Dr. Patel had understood that the stress of Plaintiff's

10  employment was a cause of the attacks, he would not have that given any weight to the absence of

11  attacks while Plaintiff was off work. When he is off work, he is not under the occupational stress

12  that caused the attacks. The absence of attacks when occupational stress is removed tends to

13  demonstrate Plaintiff's disability, not to refute it. Second, Dr. Patel apparently finds fault with the

14  fact that Plaintiff has not undergone any recent treadmill tests. Had Dr. Patel read Dr. Sobol's

15  report, he would have realized that Plaintiff suffers from a form of angina that occurs at rest and

16  that treadmill tests are not an adequate diagnostic tool. Dr. Patel's own report makes it evident

17  that he did not understand that occupational stress was a central cause of Plaintiff's disability, and

18  that Dr. Patel had not read and considered Dr. Sobol's report.

19         A few days after Dr. Patel's second report, MetLife denied Plaintiff's appeal (Admin

20  0101). The denial letter does not mention the impact of occupational stress on Plaintiff. MetLife

21  never considered that issue, even though it was central to the claim.

22         MetLife argues that it is not required to credit the opinions put forward by Plaintiff's

23  physicians. While its is no doubt true that the "courts have no warrant to require administrators

24  automatically to accord special weight to the opinions of a claimant's physician," Black & Decker

25  Disability Plan v. Nord, 538 U.S. 822, 834, 834, 123 S. Ct. 1965, 155 L. Ed. 2d 1034 (2003),

26  "[p]lan administrators, of course, may not arbitrarily refuse to credit a claimant's reliable evidence,

27  including the opinions of a treating physician." Id. Yet arbitrary refusal is what MetLife did here.

28  MetLife failed to consider the impact of occupational stress on Plaintiff's health, failed to solicit or

1    obtain a medical opinion on that subject, and failed to consider the opinions of Plaintiff's

2    physicians.

3                                            **V.**

4    **BY OVERLY COMPARTMENTALIZING ITS PHYSICIAN REVIEWS, METLIFE HAS**

5    **FAILED TO CONSIDER PLAINTIFF'S CONDITION AS A WHOLE.**

6             As discussed above, Plaintiff suffers from an array of medical conditions.  Plaintiff's

7    doctors cite the whole array as contributing to Plaintiff's disability.  Rather than address the array

8    of conditions as a whole, however, MetLife compartmentalized its review.  Thus, one physician,

9    Dr. Jares addresses Plaintiff's neurological condition as though it were an isolated condition and

10   concludes that the neurological condition, by itself, is not disabling.  Admin 0139.  Dr. Patel

11   similarly looks at only his small corner of the entire picture.  MetLife never considered the array of

12   problems as a whole.

13            Compartmentalization of this sort systematically works to deny valid claims.  Disabled

14   people often suffer from multiple problems.  Taking each problem individually, and ignoring their

15   interplay in the whole person, is a strategy designed to prevent disabled people from receiving their

16   disability insurance benefits.

17                                           **VI.**

18   **THE COURT SHOULD APPLY THE DE NOVO STANDARD OF REVIEW BECAUSE**

19   **DISCRETIONARY AUTHORITY WAS NOT DELEGATED TO METLIFE.**

20        A.           **The De Novo Standard Applies Here.**

21            Under ERISA, the default standard of review is that of de novo, as there is nothing in

22   ERISA that requires that claims decisions be afforded discretion by the courts.  Firestone Tire &

23   Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989).  MetLife must show that the plan gave it

24   discretionary authority in order to obtain judicial deference to its decision, and MetLife bears the

25   burden of proving that such discretion has been unambiguously granted under the terms of the

26   plan.  Kearney v. Standard Ins. Co., 175 F. 3d 1084, 1090 (9th Cir. 1999).

27            Here, Defendant has not produced a policy of insurance or any contract whatsoever

28   with Kaiser.  Defendant's statement that the Plan "provides LTD benefits funded through a group

1  policy of insurance issued by MetLife" is not supported by adequate documentary evidence.

2  (Defendant's Motion at 3:7-8).  Defendant's evidentiary support for this assertion is limited to two

3  documents:  (1) Kaiser Permanente Welfare Benefit Plan (Admin 001-0013); and MetLife's

4  Certificate of Insurance (Admin 0015-0050).  Neither of these documents confers discretionary

5  authority on MetLife.

6          Defendant points to the Kaiser Permanente Welfare Benefit Plan, at Admin 007, as

7  supplying the requisite discretionary delegation.  (Defendant's Motion at 13:2).  In order to qualify

8  for discretionary delegation under the Kaiser Permanente Welfare Benefit Plan, however, MetLife

9  would have to produce a contract between Kaiser and MetLife under which MetLife is responsible

10 for claim determinations.  Assuming that such a contract were produced, MetLife's discretion

11 would be limited to "the specific discretionary authority" provided by the Contract. The relevant

12 provisions of the Kaiser Permanente Welfare Benefit Plan read as follows:

13          "4.1  Named Fiduciaries.  The named fiduciaries with respect to each Plan, for

14          purposes of ERISA, shall be the Employers whose employees participate in such Plan.

15          With respect to each Program in which benefits are provided **under a Contract in**

16          **which the Insurer is responsible for review of benefit claim determinations**, such

17          Insurer is the named fiduciary with respect to such determinations, pursuant to ERISA

18          Regulation § 2560.503-1(g)(2)."

19          * * *

20          "4.2  Allocation and Delegation of Fiduciary Responsibility.

21                  a.  Each Named Fiduciary is allocated fiduciary responsibility with respect

22          to **the specific discretionary authority exercised by it, under the Contract(s)**

23          relating to the Program(s) in which such Named Fiduciary participates."

24          Admin 007. [Emphasis added.]

25          Thus, the Kaiser Permanente Welfare Benefit Plan does not, by itself, grant any

26 discretionary authority to MetLife.  Any such discretionary authority can only be found in a

27 contract between MetLife and Kaiser Permanente.  Such a contract must specifically provide that

28 MetLife is responsible for review of benefit claim determinations and provide MetLife with

"specific discretionary authority." No such contract is before the Court and it is unlikely that any such contract containing discretionary authority exists. MetLife has been prohibited from selling such a policy of insurance in California for several years. See, <u>Saffon</u>, supra, 2008 U.S. App. LEXIS 334, *5, n. 1. Since Defendant bears the burden of proof on the issue of a grant of discretion, Defendant's failure to produce such a contract mandates a finding that no grant of discretion has taken place.

The only document presented by Defendant that even resembles a contract is the Certificate of Insurance entitled Your Employee Benefit Plan. Plaintiff has objected to this document in the Evidentiary Objections filed herewith. That document is unambiguously a Certificate of Insurance. See, e.g.: "We are pleased to present you with a Certificate of Insurance. . ." (Admin 0015); "This is your Certificate of Insurance . . ." (Admin 0016); "It is important to read the rest of your Certificate. It describes your benefits . . . " (Admin 0021).

The Certificate of Insurance is not a contract. It is merely evidence that a policy has been issued. See, <u>Empire Fire and Marine Insurance Co. v. Bell</u> (1997) 55 Cal. App. 4th 1410, 1423:

> "A certificate of insurance is merely evidence that a policy has been issued. It is not a contract between the insurer and the certificate holder."

Thus, the Certificate of Insurance cannot be the contract which is needed to confer discretionary authority on MetLife. Further, the Certificate nowhere contains the grant of authority nor does it define the "specific discretionary authority" required by the Kaiser Permanente Welfare Benefit Plan to confer discretionary authority.

Finally, the Ninth Circuit has recently determined that any purported grant of discretionary authority in the Certificate of Insurance, or in a related policy of insurance, would be ineffective as a matter of law. In <u>Saffon v. Wells Fargo & Co. Long Term Disability Plan</u>, 511 F.3d 1206, 2008 U.S. App. LEXIS 334 (9th Cir. 2008), the Court was called upon to address the fact that the California Insurance Commissioner has ordered the withdrawal of policies that contain a grant of discretion of the sort referenced in MetLife's Certificate of Insurance. The Court declined to apply the Insurance Commissioner's Order in <u>Saffon</u>, because Saffon's policy went into

1   force prior to the date that the California Insurance Commissioner issued its Order.  The Court

2   demonstrated, however, that it would likely reach the opposite result but for the timing of the

3   policy.  Id. at 2008 U.S. App. LEXIS 334, *5-7.  Mr. Gracey, however, did not become disabled

4   until 2006, years after the Insurance Commissioner's Order. See, Saffon, 2008 U.S. App. LEXIS

5   334, *5, n. 1.   Long Term Disability insurance policies are typically rewritten annually. Thus, if

6   MetLife was obeying the Insurance Commissioner's Order, there is no grant of discretion to

7   MetLife under the policy.

8           When fiduciary duties are to be allocated to third parties there must also be an actual

9   delegation of discretionary authority that complies with the specific requirements of the Plan, or it

10  is deemed ineffective. Shane v. Albertson's Inc., 504 F.3d 1166 (9th Cir. 2007).  See also

11  Rodriguez-Abreu v. Chase Manhattan Bank, N.A., 986 F.2d 580, 585 (1st Cir. 1993).  Defendant

12  has not shown that such a delegation that complies with the specific requirements of the Plan has

13  taken place.  Thus, Defendant has failed to demonstrate that MetLife possesses discretion to

14  interpret the language of the Plan.  Hence, the appropriate standard of review is de novo

15          **B.**          **It Is Appropriate For the Court to Grant Judgment for Plaintiff**

16                          **under the De Novo Standard.**

17          If the Court determines that a de novo review is appropriate, it may grant judgment

18  for Plaintiff at this time. Cool Fuel, Inc. v. Connett, 685 F.2d 309, 311 (9th Cir. 1982).  As

19  discussed above, MetLife completely ignored Plaintiff's central claim that he is disabled from

20  undergoing the stress of his occupation.  There is no evidence at all among the documents

21  submitted by Defendant that suggests that Plaintiff is not disabled from stress.  There is substantial

22  evidence that Plaintiff is disabled.  Upon de novo review, the Court is compelled to grant judgment

23  to Plaintiff where, as here, there is no evidence to support the defense.

24          The documents submitted by Defendant show that Plaintiff's base salary was $7381.66

25  per month at the time of his disability.  Admin 808.  The Plan provided that he was to receive 50%

26  of his base salary in long term disability benefits. Admin 0808 and Admin 0907.  Benefits

27  commence following a six months waiting period.  Admin 0908.  Plaintiff became disabled on

28

1   January 19, 2006.  Admin 0808.  Thus, his benefits should have commenced on July 19, 2006 in

2   the amount of $3690.83 per month.  By March 19, 2008, Plaintiff should have received 21

3   monthly payments.  Thus, he should have received a total of $77,507.43.

4          These benefits would be reduced if Plaintiff receives Social Security Disability

5   Insurance.  The formula for the reduction is set forth at Admin 0909, resulting in coordinated

6   benefits equaling 60% of Plaintiff's monthly base earnings.  On December 28, 2007, Plaintiff was

7   awarded Social Security Disability Insurance Benefits (See Exhibit A to the Declaration of Donald

8   Gracey).  Social Security Administration has determined that Mr. Gracey be awarded $29,679.00

9   in back benefits, less his attorney fees and costs of $5380.00, and that Mr. Gracey will receive

10  $2003.00 per month henceforth.[2]

11         Using the Plan's formula for coordination of benefits, Plaintiff would be entitled to a

12  total of $79,721.93 through December 2007.  He received a net $24,299.00 from Social Security,

13  leaving a balance owing from the Plan of $55,422.93 as of that date.  Additionally, the Plan should

14  have paid Plaintiff $2425.99 per month for January through March.  Thus, the total of past due

15  benefits the Court should award at this time comes to $62,700.90.  In addition, the Court should

16  order the Plan to begin paying Plaintiff monthly benefits under the Plan, and should order

17  Defendant to pay Plaintiff's reasonable attorney fees in an amount determined by the appropriate

18  motion.

## VII.

## IF THE COURT DECLINES TO EMPLOY THE DE NOVO STANDARD, IT MUST EMPLOY GREAT SKEPTICISM AS DIRECTED BY ABATIE AND SAFFON.

22         In 2006 an en banc panel of the Ninth Circuit rewrote the law governing the process

23  that district courts should use when reviewing decisions by ERISA Plan Administrators.  In Abatie

---

25  [2]   The Social Security award does not appear in the documents submitted to the Court
    by Defendant, as the award was not made until after MetLife had denied Plaintiff's appeal.
26  The Social Security award is relevant to the calculation of Plaintiff's damages.  Additionally,
    on a de novo review, the Court may consider a Social Security award as evidence of Plaintiff's
27  disability.  See, e.g., Boyles v. Unum Life Ins. Co. of Am., 2006 U.S. Dist. LEXIS 88581,
    *18 (C.D. Cal. 2006);  Riedl v. General Am. Life Ins. Co., 248 F.3d 753, 759 n.4 (8th Cir.
28  2001).

v. Alta Health & Life Ins. Co., 458 F.3d 955 (9th Cir. 2006), the Court explicitly overruled its

earlier decision on this subject, and adopted an entirely new approach.  Id. at 967.

The Kaiser Permanente Summary Plan Description ("SPD") lists MetLife as the

insurer and third party administrator for LTD benefits.  (Admin 0962).  MetLife is the insurer of

the Long Term Disability Plan here at issue.  Thus, to use the terminology of Abatie, MetLife

operates under a structural conflict of interest.  Id. at 965.

Abatie instructs the district courts to employ skepticism when reviewing a decision made

by an insurer operating under a structural conflict of interest.  The level of skepticism is to be

determined on a case by case basis.  Abatie tells the district courts to weigh the insurer's conflict of

interest when reviewing the insurer's exercise of discretion.  The more serious the conflict, the greater

the skepticism that the Court should employ.  In the most severe cases, the level of skepticism is so

great as to require a de novo review.

Abatie explained that a district court must always consider the "inherent conflict that

exists when a plan administrator both administers the plan and funds it." Id. at 967. The court

should "weigh" such a conflict more or less "heavily" depending on what other evidence is

available. Id. at 968.  The court should view the conflict with a "low" "level of skepticism"

if there is no evidence "of malice, of self-dealing, or of a parsimonious claims-granting history."

Id. But it may weigh the conflict "more heavily" if there's evidence that the administrator

has given "inconsistent reasons for denial," has failed "adequately to investigate a claim or ask the

plaintiff for necessary evidence," or has "repeatedly denied benefits to deserving participants by

interpreting plan terms incorrectly." Id.

As discussed more fully below, the parties dispute what evidence is discoverable or

admissible on the level of skepticism under the Court should apply under Abatie.  Plaintiff has

asked for discovery outside the administrative record which he contends bears on the level of

skepticism.  Defendant has provided almost nothing, contending that no discovery is available.

The trial courts in the Ninth Circuit have consistently permitted discovery outside the

administrative record since Abatie.  While Abatie does not exhaustively consider what sorts of

evidence the district courts should consider, it does give some hints at the sort of evidence that

1 | might be relevant.  For example, it suggests that Plans could try to minimize the effect of a conflict

2 | as follows:

3 | "For example, the administrator might demonstrate that it used truly

4 | independent medical examiners or a neutral, independent review process; that its

5 | employees do not have incentives to deny claims; that its interpretations of the plan

6 | have been consistent among patients; or that it has minimized any potential financial

7 | gain through structure of its business (for example, through a retroactive payment

8 | system)."

9 | Id. at 969 n. 7.

10 | Thus, the Ninth Circuit has indicated that the matters listed in footnote 7 of <u>Abatie</u> are

11 | directly relevant to the standard of review to be employed by the District Court, and that evidence

12 | on those subjects is admissible.  Obviously, if defendants can bring in evidence on these subjects,

13 | so can plaintiffs.  It seems safe to say that, if MetLife had information on those subjects that would

14 | tend to show that it was entitled to a low level of skepticism, it would have produced that

15 | information voluntarily and/or would have cited it in its Motion for Summary Judgment.  Since

16 | MetLife has, instead, refused to disclose such information, it is likely that the information will be

17 | helpful to Plaintiff.

18 | Even without any further discovery, the Court is compelled to attach a high level of

19 | skepticism to its review of MetLife's handling of this claim.  MetLife gave inconsistent reasons for

20 | denial, failed to give any consideration at all to the central reason Plaintiff could not work, failed

21 | to consider at all the lengthy and thorough opinion of Dr. Sobol, a board certified cardiologist,

22 | delegated its decision making power to Dr. Patel, an underpaid novice who did not consider the

23 | central issue of the claim and did not even read Dr. Sobol's report, and compartmentalized its

24 | review of Plaintiff's medical problems in a manner that systematically works to deny valid claims.

25 | The recent Ninth Circuit case of <u>Saffon v. Wells Fargo & Co. Long Term Disability Plan</u>, 511

26 | F.3d 1206 (9th Cir. 2008) directs the Court to examine factors of this sort, and, where appropriate,

27 | to view the insurer's decision with a level of skepticism so high that de novo review is appropriate.

28 | In <u>Saffon</u>, as here, MetLife was the insurer of Plan benefits and made the decision to

deny benefits to the plaintiff.   In <u>Saffon</u>, as here, MetLife wrote incomprehensible denial letters, attempted to communicate directly with plaintiff's doctors without telling plaintiff,[3] and failed to consider significant information offered by plaintiff.   The <u>Saffon</u> Court found that MetLife had breached the duty to engage in a meaningful dialogue as required by the Ninth Circuit in <u>Booton v. Lockheed Medical Benefit Plan</u>, 110 F.3d 1461, 1463 (9th Cir. 1997).   The <u>Saffon</u> court remanded the case to the District Court with instructions to determine "the degree of deference (if any)" to be afforded to MetLife.   Id at *24.   MetLife's actions in the instant matter are at least as high-handed as they were in <u>Saffon</u>, possibly more so.   At least in <u>Saffon</u>, MetLife addressed the claim Saffon put forward.   Here, MetLife completely ignored the effects of occupational stress on Mr. Gracey, which was at the center of his claim.   MetLife is entitled to less deference here than in <u>Saffon</u>, and the Ninth Circuit was not sure that MetLife was entitled to any deference there.

## VIII.

## IF THE <u>ABATIE</u> STANDARD APPLIES, SUMMARY JUDGMENT IS NOT PROPER AND PLAINTIFF IS ENTITLED TO DISCOVERY.

This case presents a scenario that is regularly repeated in numerous ERISA cases. The administrative record does not provide the sort of evidence that the Court needs to determine the level of skepticism to apply to its review.   Any evidence that might shed light on the level of skepticism is in the hands of the Plan, the insurer, and the outside consultants employed by the insurer.   None of that evidence resides with Plaintiff.   Here, Defendant has elected not to voluntarily produce evidence bearing on the level of skepticism.

The Ninth Circuit's recent decision in <u>Welch v. Metropolitan Life Ins. Co.</u>, 490 F.3d 942 (9th Cir. 2007) reiterated <u>Abatie</u> by confirming a plaintiff's right to discovery in an ERISA case.   In <u>Welch</u>, the Ninth Circuit held that attorney fees are properly awarded for time spent conducting discovery in an ERISA case:

"Because an ERISA plaintiff may be permitted to supplement the

---

[3]     Dr. Patel states that he tried to call Dr. Hlavac without success (Admin 0135) and Dr. Jares states that he could not navigate the Kaiser voice mail system to leave a message with Dr. Hlavac (Admin 0139).   Plaintiff was not given notice of these attempts to contact is primary care doctor.   See <u>Saffon</u>, supra at *22-23.

administrative record with evidence of a conflict of interest on the part of the

defendant, see Tremain v. Bell Industries, Inc. 196 F.3d 970, 976-77 (9th Cir. 1999),

we agree with Welch that some discovery aimed at demonstrating a conflict of interest

may have been appropriate."

Id. at 949-950.

Notably, the Ninth Circuit did not find that the plaintiff was first required to

demonstrate a conflict of interest in the administrative record before conducting discovery.  In fact,

the Ninth Circuit stated that a plaintiff is entitled to conduct discovery "aimed at demonstrating a

conflict of interest." Id.

In the short time since Abatie, district courts in the Ninth Circuit have followed suit

and approved discovery requests by plaintiffs in ERISA cases.  Groom v. Standard Ins. Co., 492

F. Supp. 1202, 1204-05 (C.D. Cal. 2007); Harper v. Unum Life Ins. Co. of America,  2007 U.S.

Dist. LEXIS 47533, *9-12 (E.D. Cal. 2007); Sterio v. Highmark Life Ins. Co. 2007 U.S. Dist.

LEXIS 54035  (E.D. Cal. 2007); Beckstrand v. Electronic Arts Group Long Term Disability Ins.

Plan,  2007 U.S. Dist. LEXIS 43643, *15 (E.D. Cal. 2007) ("discovery that would lead to

evidence that, among other things, the plan had a record of denying benefits, continuously

retaining doctors who rendered opinions favorable to the plan, or had standards or protocols with

which the administrator complied . . . . Such evidence now goes to the deference that the court

will use in reviewing the merits of the case and, thus, is relevant and admissible under Abatie");

Linich v. Broadspire Services, Inc., 2007 U.S. Dist. LEXIS 19295, at *17 (D. Ariz. 2007) ("in

light of Abatie, the Court finds that Plaintiff has a valid claim for discovery outside the

administrative record regarding the conflict of interest involved in this case"); McCurdy v.

Metropolitan Life Ins. Co., 2007 U.S. Dist. LEXIS 25917, *5 (E.D. Cal 2007); Liu v. Standard

Ins. Co., 457 F. Supp. 2d 1030, 1038 (C.D. Cal 2006) (permitting depositions of medical

reviewers); Toven v. Metropolitan Life Ins. Co., 517 F. Supp. 2d 1174 (.D. Cal. 2007);  Baldoni

v. Unumprovident, 2007 U.S. Dist. LEXIS 14127 (D. Or. 2007); Gullidge v. Hartford Life &

Acc. Ins. Co., 501 F. Supp; 2d 1280, 1283 (C.D. Cal. 2007) (hours expended on discovery were

reasonable because, under Abatie and Welch, "[s]ome discovery regarding whether a conflict of

1  interest existed is therefore appropriate if the plaintiff plans to raise the issue of conflict of interest

2  at trial, which Plaintiff in this case apparently did.").

3        As explained above, MetLife failed to provide a full and fair review of Plaintiff's

4  claim before the denial of his claim.  Therefore, Plaintiff is entitled to discovery regarding whether

5  discretion was properly granted to MetLife by the welfare benefit plan, potential bias of NMR and

6  the reviewing physicians, and the extent of MetLife's conflict of interest regarding its medical

7  reviews.  Plaintiff seeks to serve written discovery on MetLife (or deposition of the person most

8  knowledgeable if the Court declines to permit written discovery), a subpoena for documents to

9  NMR and to the reviewing physicians, and possible depositions of key individuals.

10        The party who resists discovery has the burden to show that discovery should not be

11  allowed, and has the burden of clarifying, explaining, and supporting its objections." Oakes v.

12  Halvorsen Marine Ltd., 179 F.R.D 281, 283 (C.D. Cal. 1998); Allen v. Woodford, 2007 U.S.

13  Dist. LEXIS 11002  (E.D. Cal. 2007).  Here, Defendant cannot meet its burden of showing that

14  the proposed discovery should be disallowed.

15  **IX.**

16  **THE COURT SHOULD ALLOW PLAINTIFF TO CONDUCT A FULL RANGE OF**

17  **DISCOVERY ON ALL OF THE ISSUES SUGGESTED BY ABATIE.**

18        At the Case Management Conference, counsel and the Court discussed discovery in

19  this matter.  Defense counsel indicated that Defendant would likely provide some discovery

20  informally, but reserved its right to argue that discovery is not available in an ERISA action.  The

21  Court ordered Plaintiff not to propound any discovery pending the instant Motion for Summary

22  Judgment.  The Court indicated that it would consider the issue of discovery in connection with the

23  Summary Judgment motion and wanted to see what issues remained following the possible informal

24  disclosures that defense counsel thought would be forthcoming.  Unfortunately, Defendant

25  subsequently took a hard line on discovery and, except for cvs of two doctors, has been unwilling

26  to disclose anything.  Plaintiff has followed the Court's instructions at the Case Management

27  Conference and has propounded no discovery to date. It seems clear that formal discovery should

28  now proceed.

As noted above, <u>Abatie</u> makes it clear that certain facts are relevant to the level of the Court's skepticism.  Among those facts are the independence of medical examiners, the neutrality of the review process, the incentives of employees of the insurer to deny claims, consistency of interpretation of plan language, and whether it has minimized the potential of financial gain. Abatie, supra at 969 n. 7.  <u>Abatie</u> expressly recognizes the relevance of these topics.  Plaintiff has proposed discovery reasonably tailored to provide evidence bearing on these topics.

During the attempt at informal discovery, Plaintiff's counsel informally propounded a full menu of discovery options.  See, Exhibit A to the Declaration of Michael E. Kinney.  Per the suggestion of the <u>Abatie</u> Court (Id. at 969 n. 7), Plaintiff requested documents showing the financial relationship between MetLife and Kaiser Permanente (designated as Requests for Production Nos. 1 and 2).  Plaintiff requested documents bearing on whether MetLife uses a neutral, independent review process, the incentives for its claims handlers and the consistency of its interpretations of the Plan  (designated as Requests for Production Nos. 3 through 9). Plaintiff requested documents bearing on whether MetLife has minimized any potential financial gain through structure of its business (designated as Request for Production No. 10).  Plaintiff requested documents bearing on the independence of MetLife's medical examiners (designated as Requests for Production Nos. 11-14), and also asked for testimony from MetLife bearing on that subject (designated as Interrogatories 1-8) and for similar testimony from the doctors hired by MetLife (designated as proposed depositions).

It is respectfully submitted that Plaintiff's approach was consistent with <u>Abatie</u>.  It would certainly be appropriate for the Court to allow Plaintiff to proceed with discovery along the lines set forth in the letter attached as Exhibit A to the Kinney Declaration.

Following Defendant's refusal to provide informal discovery in response to Plaintiff's original request, Plaintiff's counsel learned that MetLife recently lost a Motion for Discovery in <u>Dilley v. Metropolitan Life Insurance Company</u>, Case No. C 07-1831 PJH. That motion was on all fours with the issues presented here.  Plaintiff has requested that the Court take judicial notice of that motion, the supporting declaration, and the order issued by Judge Hamilton.  It is clear from the motion that it addresses precisely the same issue as is presented here: the permissible scope of

1   post-Abatie discovery. It is also clear from that motion that MetLife has previously voluntarily

2   produced information that it resists producing here. For example, MetLife has provided extensive

3   information about its use of Network Medical Review, the company that employs Dr. Patel and

4   Dr. Jares and with which MetLife communicated in the Gracey case. See, Exhibit J at 4:4-12 to

5   the Declaration of Lissa A. Martinez (attached to the Request for Judicial Notice as Exhibit C).

6   Note that Plaintiff's counsel asked defense counsel to respond to an identical interrogatory (Kinney

7   Declaration, Exhibit C, p. 2), and defense counsel refused to respond (Kinney Declaration, Exhibit

8   D).

9           In the hope of loosening Defendant from its seemingly intractable position, Plaintiff's

10  counsel proposed an informal discovery plan along the lines of the Order issued by Judge Hamilton

11  in Dilley. Even though MetLife had already lost that battle, it still refused to provide informal

12  discovery under that model.

13          Since Judge Hamilton's Order in Dilley, another Court in the Northern District of

14  California has ordered MetLife to provide discovery. Judge Alsup issued that Order in Walker v.

15  Metropolitan Life Insurance Company; Kaiser Permanente Flexible Benefits Plan, Case No. C 07-

16  03772 WHA on February 14, 2008. A copy of that Order is attached to the Request for Judicial

17  Notice as Exhibit D. As with Dilley, the defendants in Walker are defended by the same lead

18  counsel as in Gracey. Walker involves the same defendant as Gracey.

19          Judge Alsup decided to employ an alternative to the model adopted by Judge

20  Hamilton. Rather than specify the particular discovery that plaintiff could conduct, Judge Alsup

21  elected to give Plaintiff general direction and allow plaintiff to proceed with discovery consistent

22  with those general instructions.

23          It is respectfully submitted that Judge Alsup's model for post-Abatie discovery is

24  superior to Judge Hamilton's. Judge Hamilton's model requires the court to engage in micro-

25  management of discovery, making it necessary to obtain prior court approval for each question.

26  Judge Alsup's more general structure puts the Court in its customary position with regard to

27  discovery, dealing only with specific problems as they arise.

28          Plaintiff respectfully requests that this Court issue an order similar to Judge Alsup's,

1  permitting Plaintiff to conduct written and oral discovery on the issues that <u>Abatie</u> has put into

2  play.

## X.

### CONCLUSION

5         For the foregoing reasons, Plaintiff respectfully requests that the motion for summary

6  judgment be denied and Plaintiff granted the right to conduct discovery.  Alternately, Plaintiff

7  requests judgment be entered in his favor for past benefits through the date of judgment, with

8  interest; that his benefits be reinstated on an ongoing basis; and that he be allowed to file the

9  appropriate motion for attorney fees.

10  Dated: March 6, 2008                          LAW OFFICE OF MICHAEL E. KINNEY

12                                         By: _____/s/_____
13                                              Michael E. Kinney
                                               Attorney for Plaintiff