SEDGWICK, DETERT, MORAN & ARNOLD LLP
REBECCA A. HULL  Bar No. 99802
One Market Plaza
Steuart Tower, 8th Floor
San Francisco, California 94105
Telephone: (415) 781-7900
Facsimile: (415) 781-2635
      email: rebecca.hull@sdma.com

Attorneys for Defendant
KAISER PERMANENTE FLEXIBLE
BENEFITS PLAN

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DONALD GRACEY,<br><br>    Plaintiff,<br><br>  v.<br><br>KAISER PERMANENTE FLEXIBLE BENEFITS PLAN,<br><br>    Defendant. | CASE NO. C 07-03853 (VRW)<br><br>**DEFENDANT KAISER PERMANENTE FLEXIBLE BENEFITS PLAN'S REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF <u>MOTION FOR SUMMARY JUDGMENT</u>**<br><br>**DATE:** May 1, 2008<br>**TIME:** 2:30 P.M.<br>**COURTROOM:** 6<br>**JUDGE: HON. VAUGHN R. WALKER** |

# TABLE OF CONTENTS

**PAGE**

I. INTRODUCTION ........................................................................................................... 1

II. FACTUAL DISCUSSION ............................................................................................. 3

    A. The Stress/Psych Argument ................................................................................ 4

    B. MetLife as Claim Administrator Had Discretionary Authority to Interpret the Terms of the Plan and Determine Eligibility for Benefits .................. 8

III. ARGUMENT .................................................................................................................. 11

    A. Denial Was Not an Abuse of Discretion ............................................................ 11

        1. Abuse of Discretion Review Applies ...................................................... 11

        2. The Decision Should Be Afforded a High Degree of Deference .............. 11

    B. Plaintiff Fails to Carry His Burden ..................................................................... 12

    C. "Conflict Discovery" Would Add Little ............................................................. 13

IV. CONCLUSION .............................................................................................................. 15

# TABLE OF AUTHORITIES

**PAGE**

**Cases**

*Abatie v. Alta Health & Life Ins. Co.,*
  458 F.3d 955, 965 (9th Cir. 2006) .................................................................. 10, 11, 13

*Black & Decker Disability Plan v. Nord,*
  538 U.S. 822, 825, 834 (2003) ............................................................................ 13, 15

*Cagle v. Bruner,*
  112 F.3d 1510, 1517 (11th Cir. 1997) ......................................................................... 10

*Chadwick v. Metropolitan Life Ins. Co.,*
  498 F. Supp. 2d 1309, 1315 (E.D. Cal. 2007) ............................................................ 15

*Daic v. Metropolitan Life Ins. Co.,*
  458 F. Supp. 2d 1167 (D. Hi. 2006) ........................................................................... 10

*Disanto v. Wells Fargo & Co.,*
  2007 WL 2460732 at *11 (M.D. Fla. August 24, 2007) ............................................. 15

*Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115 (1989) .................................. 11

*Ford v. Motorola Inc. Involuntary Severance Plan,*
  2007 WL 162680 (D. Az. 2007) ................................................................................ 13

*Grosz-Salomon v. Paul Revere Life Ins. Co.*
  237 F.3d 1154, 1157 n.2 (9th Cir. 2001) ...................................................................... 9

*Harper v. Unum Life Ins. Co.,*
  2007 WL 1792004 (E.D. Cal. 2007) .......................................................................... 14

*Hunt v. Metropolitan Life Ins. Co.,*
  425 F. 3d 489, 490-91 (8th Cir. 2005) ....................................................................... 13

*Jordan v. Northrop Grumman Corp. Welfare Benefit Plan,*
  63 F. Supp. 2d 1145, 1157 (C.D. Cal. 1999) .............................................................. 12

*Mongeluzo v. Baxter Travenol Long Term Disability Benefit Plan,*
  46 F.3d 938, 943-44 (9th Cir. 1995) ....................................................................... 6, 14

*Rodriguez-Abreu v. Chase Manhattan Bank, N.A.,*
  986 F.2d 580 (1st Cir. 1993) ...................................................................................... 10

*Saffon v. Wells Fargo & Co. Long Term Disability Plan*
  11 F.3d 1206 (9th Cir. 2008) ........................................................................................ 9

## Table of Authorities
### (Continued)

**PAGE**

*Shane v. Albertson's Inc. Employees' Disability Plan,*
   381 F.Supp.2d 1196 (C.D. Cal. 2005) .................................................................................. 9

*Shemano-Krupp v. Mutual of Omaha Ins. Co.,*
   2006 WL 3365595 (N.D. Cal. 2006) .................................................................................. 13

*Welch v. Metropolitan Life Ins. Co.,*
   490 F.3d 942 (9th Cir. 2007) .............................................................................................. 13

### Statutes

29 C.F.R. § 2560 .................................................................................................................... 11

### Regulations

ERISA Regulation § 2560.503-1(g)(2) .................................................................................. 10

I.    **INTRODUCTION**

Plaintiff Donald Gracey was a Project Manager for Kaiser Foundation Health Plan, Inc. ("KFHP"). The administrative record, discussed in detail in defendant Kaiser Permanente Flexible Benefit Plan's ("Plan") moving papers, shows that he had a coronary bypass in 2000, and occasional episodes of angina thereafter. In mid-January 2006, he was briefly hospitalized for chest pain, but his test results were essentially normal.

In his opposition to the Plan's summary judgment motion, plaintiff argues that the Plan's claim administrator for long term disability ("LTD") benefits, Metropolitan Life Insurance Company ("MetLife") ignored his history of stress, and thus erred in denying his claim. The administrative record shows otherwise; MetLife considered the records relating to stress, but came to a different conclusion than that urged by plaintiff.

Plaintiff also argues that, notwithstanding multiple plan documents that so state, the Plan did not grant discretion to MetLife with regard to LTD claim decisions, and that his claim therefore should be reviewed *de novo* by this Court. He is incorrect for the reasons discussed below. Building upon his theory that the claim should be reviewed *de novo*, he then argues that under a *de novo* standard the Court should enter summary judgment for him – despite the fact that he has not made such a motion. Again, he is incorrect, and he has not demonstrated that, if a *de novo* standard were appropriate, he would be entitled to prevail as a matter of law.

Finally, plaintiff argues that if the Plan granted discretion, nevertheless the decision to deny his claim should receive no deference. His reasoning is unclear, but he appears to contend that it was an abuse of discretion for MetLife to credit the opinion of Dr. Patel, who is board certified in both internal medicine and cardiology (ADMIN 113).[1] He also urges that discovery should be authorized, in effect making an application for continuance under Federal Rule of Civil

---

[1] Plaintiff tries to discredit Dr. Patel with dismissive terms such as "young," "novice" and so on. *See, e.g.*, Plaintiff's Opposition ("Plt. Opp."), pp. 7-8. It appears that the file contained an old c.v., created after Dr. Patel became board certified in internal medicine, and while he was completing his cardiology certification. By the date of his initial report about plaintiff, Dr. Patel had been certificated in cardiology (ADMIN 137), and by the time he issued his supplemental report, he was board certified in cardiology as well as in internal medicine. (ADMIN 113).

Procedure 56(f), but does not articulate with specificity what it is he seeks, or how it would materially assist his opposition.[2] There is no basis on which to delay resolution of the Plan's motion.

The Plan's motion shows (1) MetLife is the Plan's claim administrator for LTD benefits, (2) MetLife carries out its duties under a grant of discretion and authority to make claim determinations, and (3) MetLife did not abuse its discretion in denying the claim. MetLife adjudicated plaintiff's claim only after thorough reviews of the relevant records, including multiple attempts to discuss the case with plaintiff's treating doctor, whose records did not substantiate plaintiff's asserted limitations. In all of the circumstances, that decision was not an abuse of discretion, and should be sustained.

---

[2] Plaintiff inappropriately seeks standard "insurance bad faith" discovery. *See* Declaration of Michael Kinney, Ex. A. As the Plan explained in response to his informal demand, however, the type of information he seeks is not probative of the issue of a conflict of interest. *See* Kinney Decl., Ex. B. Although plaintiff directs the Court's attention to Judge Hamilton's order permitting the plaintiff in *Dilley* to propound discovery to MetLife, he fails to inform the Court of MetLife's verified responses to that discovery. As shown in Exhibit A to the Declaration of Rebecca A. Hull, filed herewith, MetLife cannot provide detailed or specific information about the disposition of claims that were sent for outside independent review, except after substantial delay and prohibitive expense; MetLife and Dilley's counsel are beginning the meet and confer process regarding that problem. *Id.*, ¶ 3. Similarly, plaintiff's and MetLife's counsel in *Walker*, to which this Court also has been directed, currently are meeting and conferring about the same issues, which remain unresolved. *Id.* ¶ 4.

Compiling the information plaintiff seeks (if he follows the models of his peers) likewise would involve substantial time and money. During the period 2005 through 2007, approximately 9,000 claims were referred to Network Medical Review ("NMR") to obtain an independent medical review by a physician(s) in appropriate specialties, as selected by NMR. During that same period there were approximately 92,000 new claims received and processed by MetLife. *Id.*, Ex. A at No. 5.

Even if the information could readily be compiled, however, no meaningful conclusion could be drawn from bare numbers of claims approved or denied, since the merit of any given claim is almost entirely fact-specific; thus, a mini trial on every claim would be needed. Leaving aside difficulties such as privacy issues, such an exercise would be costly and time consuming, with a high potential for inconsistent results from case to case, given that (as already happened here) the same discovery will be attempted by many plaintiffs, each with their own theories about whether a particular claimant should have received benefits following an NMR record review.

## II. FACTUAL DISCUSSION[3]

Plaintiff's opposition contends that MetLife did not consider the impact of stress in deciding his claim, and thus abused its discretion. The record shows, to the contrary, that MetLife did consider such issues, but found they were not sufficient to support the claim.

MetLife's decision was not an abuse of discretion. Plaintiff's treating doctor, Dr. Hlavac, was supportive of plaintiff's request for disability status (*see* ADMIN 237), and offered "stress" as his rationale for doing so despite the fact that plaintiff had not had serious angina problems for years, and had unremarkable cardiac test results for years. Further, the "stress" rationale is undercut by plaintiff's records, as it is premised on the proposition that occupational stress caused plaintiff increased cardiac problems, and that plaintiff therefore must avoid working in his occupation. Even assuming that there was a sufficiently close connection between plaintiff's stress and his documented medical conditions to warrant ceasing work altogether – which is not established by the administrative record – the primary stressors in plaintiff's life were not ones related to his occupation, but ones related to personal relationships in his family or with his superiors at work.[4]

The absence of a direct relationship between plaintiff's stress and his cardiac and other problems is borne out by the fact that it was not until four months after he stopped working that he asked Dr. Hlavac to place him on permanent disability, saying that he was experiencing chest pains. Similarly, although he reported chest pain and went to an emergency room a few days before he stopped working, the cardiac testing done at that time yielded normal results – that is, despite all the stressors for which he was receiving psychiatric treatment (see discussion below), he was not having a recurrence of cardiac problems, nor had he experienced a recurrence for

---

[3] Defendants do not wish to burden the Court with unnecessary repetition of the discussion in their moving papers ("Def. MSJ"), but will direct the Court's attention to the relevant portions.

[4] As discussed in the Plan's moving papers (Def. MSJ, p. 3), one's "own occupation" does not mean one's specific job, but rather the same occupation performed for any local employer. In other words, plaintiff's clashes with his supervisors and coemployees at his specific Kaiser job are not determinative of whether he could perform his own occupation, but for a different employer.

several years.

### A. The Stress/Psych Argument

Plaintiff filed his claim for LTD benefits on April 28, 2006, alleging that he was disabled from working in his occupation of project manager. His claim (ADMIN 802) disclosed his disability as: "Stress and diabetes and heart condition. Stress raises my heart rate even with medication[5] – depression[,] I am unable to function."

In contrast, plaintiff's treating doctor, Dr. Hlavac, provided an Attending Physician Statement ("APS") on June 2, 2006.[6] The APS certified that plaintiff's disability was: cardiac arteriosclerosis disease ("CAD"), cardiomyopathy, chest pains, shortness of breath, fatigue and weakness, and gave a cardiac disability rating of Class II/III. (ADMIN 771-72). The APS made no mention of stress or depression as disabling.

MetLife evaluated the medical records it had received, and concluded that there was insufficient documentation of current cardiac and other complaints to support total disability under the terms of the Plan. (ADMIN 55-56.) In light of the claim form, plaintiff's psychiatric records then were requested to explore the possibility of a psychiatric disability. (ADMIN 58-59; 734.)

The psychiatric records showed that on January 23, 2006, plaintiff had been seen at the Kaiser Department of Mental Health ("DMH") because he was "very upset" about a sexual harassment charge against him. He reported that he had received a letter of apology (the charge apparently was determined to be unfounded), but DMH staff nevertheless approved him to be off work until January 31, 2006. (ADMIN 741-42) At an appointment with DMH on February 2 (ADMIN 743), he informed the staff that he would return to work on February 6.

Plaintiff had another appointment with DMH on March 13 (ADMIN 745), and Dr. Angela Hasty recorded that he had "chest pressure [and] wants to drink when slightly stressed.

---

[5] The record contains no medical support for this assertion.

[6] Plaintiff saw Dr. Hlavac on May 16 and asked to be put on "permanent disability." He told Dr. Hlavac that (although his LTD claim said he was on workers' compensation) he tried to return to work and experienced chest pain, palpitations and other symptoms. There is no clinical documentation of abnormal test results or findings at this time. (ADMIN 237.)

Dealing [with] home contractors. Feels hypersensitive [and] paranoid like that people don't like him. Encouraged to discuss this at med. appt. this afternoon." A second record on March 13 (ADMIN 746) records that plaintiff was "applying for permanent disability for his depression . . . he has always felt depressed . . . ."[7]

On April 10, 2006, plaintiff and Dr. Hasty discussed his "depressive thoughts including thoughts of wanting to die. . . . Discussed what would make his life worth living. [Patient] says a life of writing 24 hrs would do that. [Patient] agrees to find time to begin writing." (ADMIN 748.) On April 17, Dr. Hasty recorded: "[Patient] wrote an essay on pros of assisted suicide. [Patient] says he feels happier because he is now finding time to write and is accepting that 'we can always be happy.' . . . [Patient] asked if I could give him feedback on his novel once I leave [Pleasant] Hill clinic next week. Explained that because he has been my [patient] I would not be allowed to do that." (ADMIN 749.)

MetLife called DMH on July 21, 2006. DMH was asked (1) whether plaintiff's primary disabling diagnosis was psychiatric or physical, (2) whether he was disabled by a psychiatric condition, and (3) whether DMH had taken him off work. (ADMIN 59.) On July 24, DMH responded that "psychiatric providers reported that they are not disabling [sic] this [employee]." DMH referred MetLife back to plaintiff's regular treating doctors. (ADMIN 60.)[8]

---

[7] It is unclear whether this is a reference to an intent to apply for LTD Plan benefits (which could provide a maximum of 24 months of benefits for a substantiated psychiatric disability), which plaintiff submitted some six weeks later, or perhaps refers to some other type of benefit such as workers' compensation (which he reported in his LTD claim he already was receiving).

[8] Thus, it was DMH – plaintiff's psychiatric treaters – that directed the inquiry regarding plaintiff's claimed disability away from psychiatric factors, such as stress and depression, and toward physical issues. In addition, contemporaneous MetLife electronic diary notes reflect that plaintiff's counsel on March 8, 2007, expressly disavowed a psychiatric basis for the claim. (ADMIN 79; see ADMIN 77.) When plaintiff's appeal was unsuccessful (and the denial letter specifically mentioned that discussion [see ADMIN 102]), his attorney sent an artfully worded letter that denied that he had such a conversation with MetLife "on March 3, 2007" (ADMIN 95; see ADMIN 79, March 8, 2007, at 15:18; cf. ADMIN 102 [typographical error stating date as March "3" rather than March "8"].)
The accuracy of the claim file entry on March 8 is inferentially supported by the inadmissible Declaration of Donald Gracey (to which the Plan objects, as set forth in its separate Objections to Plaintiff's Evidence in Opposition to Motion for Summary Judgment). Gracey's Declaration has

1    In a letter to plaintiff on July 27, 2006, MetLife explained that his records had been
2 reviewed but nothing substantiated current cardiac problems (as distinct from historical ones).
3 The letter discussed that a psychiatric clinical specialist had reviewed the file for psychiatric
4 issues, and that Kaiser DMH had advised that plaintiff was not disabled by psychiatric issues.
5 Due to lack of medical or psychiatric evidence of functional limitations, the claim was denied.
6    On August 7, 2006, Dr. Hlavac wrote a conclusory note stating that plaintiff was "unable
7 to work as a project manager for any company or corporation due to stress and the affect [sic]
8 that it has on his chronic conditions." (ADMIN 723.) He gave no examples of instances in
9 which that had occurred and no clinical basis for his statement. Plaintiff also submitted further
10 medical records, which were reviewed and evaluated by MetLife. The records reflected a brief
11 hospital admission on January 13 and an emergency room visit on January 16, 2006, in which
12 plaintiff reported chest pain, yet his test results and workup were normal. On September 6, 2006,

---

attached to it a document that purports to be a December 28, 2007, opinion granting Social Security Disability Insurance ("SSDI") benefits. The opinion recites in detail plaintiff's various psychiatric problems, finding that he was diagnosed with major depression in June 2006, as reflected in evaluations by a Dr. Khoi and a Dr. Brody – whose evaluations were not provided to MetLife as having a bearing on the claim for LTD benefits under the Plan. Plaintiff's counsel, of course, had received the complete administrative record from MetLife and knew that those documents were not contained in it, yet made no mention of Drs. Khoi and Brody, and made no effort to obtain or provide their records. The Plan submits that this was a conscious decision that was made in an effort to maximize potential benefits by avoiding a 24-month maximum benefit limitation that would apply if plaintiff's claim were approved based upon a psychiatric diagnosis. The Plan further notes that, even after plaintiff's attorney tried to claim post-appeal that he had not disavowed a psychiatric claim, <u>no records from these sources were provided to MetLife</u>. The SSDI award has no relevance here. It did not exist at the time the claim was decided, and thus can have no bearing on whether MetLife abused its discretion in denying the claim. It was decided under completely different standards from those that pertain under the Plan. *See Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 832 (2003). It also is irrelevant under a *de novo* standard, because in a *de novo* review a court's ability to consider evidence outside the administrative record is limited to materials that the court requires in order to understand the record sufficiently to conduct a *de novo* review. *See Mongeluzo v. Baxter Travenol Disability Benefit Plan*, 46 F.3d 938, 944 (9th Cir. 1993). Plaintiff's excuse for putting the SSDI award letter itself in the record – that it goes to the calculation of benefits – is simply implausible, given that (1) plaintiff did not make a motion, (2) the SSDI award letter deals with the <u>reasons</u> for (not the amount of ) the award, (3) benefit calculations are irrelevant to the Plan's motion, and (4) if benefit calculations were relevant, plaintiff's declaration provides the numbers.

1  therefore, MetLife again wrote to plaintiff, denying the claim because recently received records
2  did not show a serious functional limitation. (ADMIN 346-47.) In connection with plaintiff's
3  complaint to the California Department of Insurance, MetLife also wrote to his attorney in
4  greater detail. (ADMIN 353.)
5        On appeal, MetLife, as required by ERISA regulations, referred the file to NMR, a
6  company that provides referral services for independent medical review by physicians with the
7  appropriate areas of medical specialization.[9] The subsequent reviews by Drs. Patel and Jares are
8  discussed in detail in the Plan's moving papers. *See* Def. MSJ, pp. 9-12. Only a few of plaintiff's
9  arguments about those reviews (which were detailed and specific, and observed that plaintiff's
10 cardiac problems had been stable and under control for at least a year before he stopped working,
11 despite the stress he reportedly was experiencing while working) require further comment here.
12       First, the claim that MetLife artificially restricted the scope of the reviewing physicians'
13 analysis is premised on a tortured reading of MetLife's instructions for the reviews. MetLife
14 directed that the reviewing physicians were to "[p]lease define the claimant's current level of
15 functionality based on your review of all material provided, medical documentation and/or
16 physical examination according to DOT physical demands." (ADMIN 146 [emphasis added].)
17 Although the instruction clearly is disjunctive – review of materials, medical documentation
18 and/or "physical exam under DOT standards" – and although there was no physical exam (that is,
19 DOT standards did not come into play) plaintiff turns this on its head, saying that only DOT
20 physical standards were used, and that this invalidates the opinions provided by the reviewers.[10]
21       Second, the assertion that the reviewing doctors either were directed to disregard stress
22 issues, or did not understand that they could consider stress issues, is belied by the question the

---

[9] Plaintiff's dismissal of NMR as "a company providing medical reviews for insurance companies" is unsupported and as such should be disregarded.

[10] Similarly, plaintiff argues that because Dr. Patel did not specifically single out Dr. Sobol's report (most of which recited the contents of the same primary records Dr. Patel reviewed, as documented on the first page of his report [ADMIN 137]), this means that he was not given Dr. Sobol's report. Plt. Opp., p. 9. The administrative record, however, reflects that Dr. Patel did receive and review Dr. Sobol's report. *See id.*

1  independent physicians were specifically asked to answer: "Does the medical information
2  support functional limitations for beyond 7/17/06 (job is light)? Functional limitations include
3  <u>any</u> reduction in ability to work full time." (ADMIN 147 [emphasis added].)
4      Finally, the implication that MetLife tried to tie reviewers' hands and limit their analysis
5  is contrary to the express instruction to "please call" the treating doctor, and which gave his
6  telephone number. Both reviewers reported multiple attempts to comply, but their phone
7  messages to the treating doctor were ignored.

    **B.    MetLife as Claim Administrator Had Discretionary Authority to Interpret the Terms of the Plan and Determine Eligibility for Benefits**

    Plaintiff's argument that the Plan purportedly does not grant discretion to MetLife is difficult to follow. As set out above, the Plan <u>expressly</u> confers discretion on MetLife, and also identifies it as the entity charged with making the type of decision in issue here. (*See* ADMIN 7, 13, 907, 962-63.)[11] Plaintiff's argument seems to be that there was no grant of discretion applicable to MetLife, because the funding contract is not in the record and that the failure to put the funding contract into the record somehow vitiates express grants of discretion in the plan documents. His argument is not logical, is contrary to the evidence, and is not supported by applicable law.

    Plaintiff says that a statement in the Plan's motion that benefits are funded by a MetLife policy is not supported by the record.[12] Plt. Opp. p. 11. In fact, the record shows that LTD benefits are "insured," and that the "type of administration" for benefits is "insured," and that the "funding medium" is "insured agreement premiums paid from general assets." (ADMIN 959.)

    The SPD discloses that LTD benefits are funded by an "insured agreement," that the "type of administration" is "insured," and the Plan documents specifically disclose that (1) LTD

---

[11] The plan document entitled "Kaiser Permanente Benefits for You . . . November 2003 Summary Plan Description" (ADMIN 814-974) identifies MetLife as "the insurer and third party administrator for . . . Long-Term Disability insurance" (ADMIN 962) and as "the administrator for Long-Term Disability claims" (ADMIN 963), and discloses that LTD benefits are insured by MetLife, with "insured" administration, funded through insurance contracts. (ADMIN 959.)

[12] Plaintiff apparently has not considered that, if he disputes the existence of an insurance policy, then his contention that MetLife had a structural conflict of interest necessarily collapses.

-8-    CASE NO. C 07-03853 (VRW)
DEFENDANT'S REPLY ISO MOTION FOR SUMMARY JUDGMENT

1 benefits are insured, (2) MetLife decides LTD claims, and (3) one Program under the Plan is the
2 MetLife contract. Plaintiff nevertheless insists that MetLife is not within the Plan provision that
3 states, "With respect to each Program in which benefits are provided under a Contract in which
4 the Insurer is responsible for review of benefit claim determinations, such Insurer is the named
5 fiduciary...." (ADMIN 7.) The contention that some tertiary level of parsing of the underlying
6 funding documents is required in order for the Plan to have conferred discretion upon MetLife
7 regarding claim decisions is simply wrong. First, the Plan itself is quite clear: if benefits are
8 insured and an insurer makes claim decisions – as is indisputably the case here, and as the SPD
9 discloses is the case here – the insurer has discretionary authority as to such decisions.

10 Second, the case law plaintiff cites has no application here. *Saffon v. Wells Fargo & Co.*
11 *Long Term Disability Plan*, 511 F.3d 1206 (9th Cir. 2008) does not stand for the proposition that
12 a grant of discretion, if found in a certificate of insurance, "would be ineffective as a matter of
13 law." Plt. Opp. 12:23-24. Rather, the Ninth Circuit in *Saffon* pointed out that the attempt by the
14 California Insurance Commissioner to regulate such matters might be preempted by ERISA.
15 *Saffon*, 511 F.3d at 1211. The Ninth Circuit found no reason to reach that question, however, as
16 the Insurance Commissioner's action in 2004 was not retroactive. *Id.* Indeed, *Saffon* found that
17 the <u>same</u> language in issue here <u>does</u> confer discretion. *Id.* at 1209-10. A perusal of the
18 insurance certificate here readily reveals (ADMIN 16) that it relates to a policy that took effect
19 January 1, 1997. It therefore is beyond any question that lingers post-*Saffon*. *See also Grosz-*
20 *Salomon v. Paul Revere Life Ins. Co.*, 237 F.3d 1154, 1157 n.2 (9th Cir. 2001).

21 Similarly, cases cited by plaintiff where a plan granted *exclusive* discretionary authority to
22 one entity, and the issue was whether a different entity's act was covered by that grant, are not
23 relevant here. *See Shane v. Albertson's Inc. Employees' Disability Plan*, 381 F.Supp.2d 1196
24 (C.D. Cal. 2005); there, the question of "whether or not Total Disability exists" was to be
25 determined by trustees "in their sole and absolute discretion." 381 F.Supp.2d at 1200 (emphasis
26 deleted). The *Shane* court concluded that the plan did not grant discretion to anyone other than
27 trustees; thus decisions by a third party were not covered without evidence of a delegation of the
28 trustees' exclusive discretion. *Id.* at 1203. The same was true of the other case cited by

plaintiff, *Rodriguez-Abreu v. Chase Manhattan Bank, N.A.*, 986 F.2d 580 (1st Cir. 1993).

Here, in contrast, there *was* an express delegation by the Plan of discretionary authority to insurers (one of which was MetLife) who determine benefits under contracts of insurance (as MetLife did). Plaintiff's argument fails to take account of the Ninth Circuit's reminder, in *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 965 (9th Cir. 2006), that no "magic words" are required in order for fiduciaries to have discretion, and that the issue of discretion must be resolved from plan documents viewed as a whole.[13] The umbrella plan document, entitled "Kaiser Permanente Welfare Benefits Plan," conclusively demonstrates that the Plan confers discretion on MetLife:

> 4.1  Named Fiduciaries. The named fiduciaries with respect to each Plan, for purposes of ERISA, shall be the Employers whose employees participate in such Plan. **With respect to each Program in which benefits are provided under a Contract in which the Insurer is responsible for review of the benefit claim determination, such Insurer is the named fiduciary with respect to such determinations**, pursuant to ERISA Regulation § 2560.503-1(g)(2).
>
> . . . .
>
> 4.3  Discretionary Authority of Fiduciaries. **Each named Fiduciary . . . shall have full and complete authority with respect to its responsibilities under the Plan and any Program hereunder.**[14] All actions, interpretations, and decisions of a Named Fiduciary . . . shall be conclusive and binding on all personas and shall be given the maximum possible deference allowed by law.

(ADMIN 7 [emphasis added]) MetLife, the claim administrator, determined in its discretion that plaintiff was not disabled under the terms of the Plan, and therefore was not eligible for LTD benefits under the Plan. The Plan documents expressly identify MetLife as the entity charged with making such decisions. (ADMIN 16-17, 49-50) At the conclusion of its exhaustive review of the entire file, MetLife determined that plaintiff was not "disabled" under the Plan, and

---

[13] *See also Cagle v. Bruner*, 112 F.3d 1510, 1517 (11th Cir. 1997) [grant of discretion need not appear in particular plan document to be effective, if found in any plan document]; *Daic v. Metropolitan Life Ins. Co.*, 458 F. Supp. 2d 1167 (D. Hi. 2006) [same].

[14] Programs covered by the Plan are set out in Appendix A. (ADMIN 13) Appendix A shows "Metropolitan Life Insurance Company Contract 95910, 95911" as a Program covered by this plan document. (*Id.*)

therefore, upheld the denial of Plan benefits. (ADMIN 101-105) The determination was not an abuse of discretion, but was rationally supported by the complete administrative record.

## III. ARGUMENT

### A. Denial Was Not an Abuse of Discretion

#### 1. Abuse of Discretion Review Applies

Plaintiff contends that the denial of his claim should be reviewed by this Court *de novo*, based on his theory that the Plan did not confer discretion on MetLife. Because his premise is incorrect, his argument must be rejected. The Plan language confers discretionary authority on the claim administrator, MetLife, to construe the terms of the Plan and make the decision in issue here. (ADMIN 7, 49) Thus, the standard of review is abuse of discretion. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).

#### 2. The Decision Should Be Afforded a High Degree of Deference

*Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955 (9th Cir. 2006), holds that the Court has discretion to determine how much deference to afford a claim decision. "A district court, when faced with all the facts and circumstances, must decide in each case how much or how little to credit the plan administrator's reason for denying insurance coverage." *Id.* at 968. Plaintiff points to nothing indicating that the decision regarding his claim is entitled to less than full deference under the Plan's grant of discretion.

There was a lengthy and ongoing exchange of information between and among MetLife, plaintiff's treating doctors, and the independent consulting doctors. Ultimately, the Plan was entitled to credit the medical opinions of a board certified internist with a specialty in cardiology, and a board certified neurologist, each of whom reviewed the medical records and separately opined that plaintiff's medical issues did not limit his functionality such as to make him incapable of performing his own occupation. The board certified specialists fully considered the attending physicians' comments, in reaching their ultimate opinions regarding plaintiff's level of functional impairment. ERISA regulations ***require such reviews***. See 29 C.F.R. § 2560-503-1(h)(3)(iii), (4). It is axiomatic that, having obtained the necessary reviews, MetLife was entitled to credit them.

B.  **Plaintiff Fails to Carry His Burden**

Plaintiff's opposition to the Plan's summary judgment motion, and in particular his attempt to place a December 2007 SSDI award into the record,[15] cannot be allowed to frustrate the Plan's right to obtain summary disposition of this claim. Although it is not admissible for the reasons separately set forth in the Plan's objections to plaintiff's evidence, the SSDI award shows that plaintiff was providing only selective information to MetLife – throughout the SSDI decision, there are references to multiple doctors who are *never* mentioned in the administrative record, for the simple reason that plaintiff and his counsel never provided their names or their records to MetLife for its consideration.

Moreover, the administrative record includes a contemporaneous recordation of the waiver of any psychiatric claim – of which "stress" would be a classic example – during the time that records were being presented to MetLife for plaintiff's appeal. The post-appeal attempt to dispute a "March 3, 2007" conversation with MetLife about the claim rings particularly hollow.

It is at all times the claimant's burden to support his claim, and to provide proper documentation to that end. *See Jordan v. Northrop Grumman Corp. Welfare Benefit Plan,*, 63 F. Supp. 2d 1145, 1157 (C.D. Cal. 1999), *aff'd*, 370 F.3d 869 (9th Cir. 2004). Plaintiff's argument that MetLife was required to accept his treating physician's conclusory assertion of disability is contrary to the law, as articulated by the Supreme Court: "We hold that plan administrators are

---

[15] Plaintiff's excuse for trying to put this into the record is that he supposedly is entitled to summary judgment (which he did not seek, and which his case authorities do not support). He theorizes that the SSDI benefits would then be relevant as an offset, although no issue about benefit calculation is raised in the Plan's motion. If plaintiff had moved for summary judgment (which he did not) and if there were a basis on which such a motion could be granted (which there is not), nevertheless the appropriate course of action would not be a benefit calculation by the Court, but a remand to the claim administrator to calculate all appropriate offsets (including, *e.g.*, workers' compensation benefits, which his claims showed he was receiving). Further, given that the only issue presented by his claim or considered by the claim administrator was whether he was disabled from his "own occupation," it would be necessary, as of 24 months of benefits, for the claim administrator to determine whether he was eligible for benefits under the "any gainful occupation" standard that pertains after 24 months. (ADMIN 27.) Alternatively, if plaintiff persuaded the Court that his psychiatric problems were disabling (as the Social Security Administration apparently accepted), benefits would simply end after 24 months.

1  not obligated to accord special deference to the opinions of treating physicians." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 825, 834 (2003). *See also Hunt v. Metropolitan Life Ins. Co.*, 425 F. 3d 489, 490-91 (8th Cir. 2005) [treating physician opined plaintiff was disabled; MetLife "was nevertheless entitled to rely on the opinions of two reviewing physicians who gave contrary opinions" and "did not abuse its discretion in denying Hunt LTD benefits"].

### C.  "Conflict Discovery" Would Add Little

Plaintiff suggests in conclusory language that he should be permitted to conduct vaguely referenced discovery in order to try to demonstrate that MetLife's structural conflict of interest affected its determination of his claim. He fails to meet the standards of Federal Rule of Civil Procedure 56(f), because he does not explain what information such discovery could yield, or how it would materially assist his opposition to the Plan's motion. More importantly, it appears that the substantial bulk of the discovery plaintiff would like to conduct has nothing to do with a conflict of interest allegedly affecting the claim decision. Rather, he wants to conduct standard "bad faith" discovery about the *merits* of the decision. Even those courts that have permitted conflict related discovery in ERISA actions have rejected such efforts, however.

Plaintiff cites to a few opinions that permitted limited discovery based on the specific circumstances of those cases,[16] but neglects to mention other cases from courts within the Ninth Circuit that refused discovery after *Abatie*.[17] *See, e.g., Ford v. Motorola Inc. Involuntary Severance Plan*, 2007 WL 162680 (D. Az. 2007), at *7 n.2 ("The Court, having considered the inherent conflict of interest . . . finds that additional discovery is not necessary"); *Shemano-Krupp v. Mutual of Omaha Ins. Co.*, 2006 WL 3365595 (N.D. Cal. 2006), at *9 ("Plaintiff requests discovery to uncover the extent of other possible conflicts. . . . Plaintiff's request to take

---

[16] Plaintiff's reliance on *Welch v. Metropolitan Life Ins. Co.*, 490 F.3d 942 (9th Cir. 2007) is particularly puzzling. First, contrary to his characterization, the case does not "confirm a plaintiff's right to discovery in an ERISA case" (Plt. Opp. p. 17) but addresses whether a district court abused its discretion in reducing the fees recoverable for discovery that had been allowed. What is instructive, of course, is that the total fees claimed (for preparing discovery as well as doing other tasks) were only 8.75 hours, and the fees allowed for all those tasks combined were only 4.75 hours – making it clear that nothing on the scale sought here was permitted in *Welch*.

[17] *Abatie*, of course, does not discuss the issue of whether discovery is appropriate.

additional discovery is DENIED.").

Here, plaintiff has not specifically identified what discovery he would seek, but vaguely mentions records subpoenas and "depositions of key individuals" who are not further identified. The clearest articulation of the fallacy of his position is found in *Harper v. Unum Life Ins. Co.*, 2007 WL 1792004 (E.D. Cal. 2007), where the plaintiff sought depositions of claim analysts and medical personnel. *Id*. at *2. In rejecting the argument that she had a right to conduct such discovery, the district court ruled:

> Defendant argues, and this Court agrees, that the depositions Plaintiff seeks are not related to conflict of interest, but rather seek information related to a challenge to the decision made by Defendant. Plaintiff argues that the discovery *is* related to a conflict of interest because it will reveal that Defendant and its employees ignored and/or contradicted evidence specifically to deny Plaintiff's claim for benefits. Plaintiff's reasoning, though, misunderstands the distinction between conflict of interest discovery and discovery on the merits of her claim. Despite her belief, the discovery Plaintiff seeks goes *directly* to the reasoning behind the denial. . . . Under the abuse of discretion standard applicable to this case, however, the administrative record stands on its own, meaning that the case will be evaluated solely on the information contained within it. This renders the motivations and thought processes behind the actions of little use to the Court.

*Id*. at *5 (emphasis in original).

The court in *Harper* considered the amount of compensation paid to medical personnel relevant to the conflict of interest issue, and permitted plaintiff to propound interrogatories. *Id.* Here, plaintiff apparently has obtained comparable information from other cases, although he has offered the Court no explanation as to how it supposedly bears on any argument he makes. There is no reason to authorize the gathering of cumulative evidence, which anything he proposes to do would be.[18]

---

[18] As *Harper* held, discovery aimed at the merits of reviewing doctors' opinions – that is, why they reached the conclusions they did and on what basis – is not "conflict" discovery, and thus is not appropriate in any case, as review will be for abuse of discretion (and a fiduciary cannot be found, on the basis of information that was not before it, to have abused its discretion). Even when a court's review is *de novo*, a case will be decided on the basis of the administrative record, and discovery will be appropriate only when and to the extent that the reviewing court requires additional information in order to understand the administrative record. *See Mongeluzo v. Baxter Travenol Long Term Disability Benefit Plan*, 46 F.3d 938, 943-44 (9th Cir. 1995).

Moreover, courts that have considered this issue after *Nord* have held that mere retention of an independent physician consultant to conduct a file review is not a basis for permitting plaintiffs to conduct discovery.

> [P]laintiff's arguments in support of extending discovery are not persuasive. Plaintiff baldly questions the background, training, experience, and financial relationship of defendant's independent physician, Dr. Lumpkins. (Opp'n at 7.) However, the record establishes that Dr. Lumpkins is a physician specialized in rheumatology who reasonably concluded, based on the information at her disposal, that plaintiff was not fully prevented from working. Plaintiff presents no reasons or evidence to find otherwise, and thus, the court cannot find that the requested discovery would demonstrate the existence of a conflict beyond the inherent conflict presented because defendant administrates and funds the Plan.

*Chadwick v. Metropolitan Life Ins. Co.*, 498 F. Supp. 2d 1309, 1315 (E.D. Cal. 2007); *see also Disanto v. Wells Fargo & Co.*, 2007 WL 2460732 at *11 (M.D. Fla. August 24, 2007) (rejecting contention that physician's opinions should be ignored because he was retained through NMR).

## IV.  CONCLUSION

The medical records submitted to MetLife did not establish functional impairment from plaintiff's own occupation, and he therefore failed to establish that he was disabled, as defined by the Plan. Indeed, the claim determination was supported by substantial evidence, including the medical opinions of two independent board-certified physicians. Thus, it was not an abuse of discretion for the Plan's claim administrator to deny his claim. Consequently, the Plan requests that the Court grant its motion for summary judgment and enter judgment in its favor.

Dated: March 13, 2008

SEDGWICK, DETERT, MORAN & ARNOLD LLP

By _____
Rebecca A. Hull

Attorneys for Defendant
KAISER PERMANENTE FLEXIBLE BENEFITS PLAN