1  SEDGWICK, DETERT, MORAN & ARNOLD LLP
   REBECCA A. HULL  Bar No. 99802
2  One Market Plaza
   Steuart Tower, 8th Floor
3  San Francisco, California 94105
   Telephone: (415) 781-7900
4  Facsimile: (415) 781-2635
5        email: rebecca.hull@sdma.com
6  Attorneys for Defendant
7  KAISER PERMANENTE FLEXIBLE
   BENEFITS PLAN
8

9              UNITED STATES DISTRICT COURT

10            NORTHERN DISTRICT OF CALIFORNIA

11  DONALD GRACEY,                        CASE NO. C 07-03853 (VRW)

12        Plaintiff,                      **DEFENDANT KAISER PERMANENTE**
                                          **FLEXIBLE BENEFITS PLAN'S**
13        v.                              **MEMORANDUM OF POINTS AND**
                                          **AUTHORITIES RE POTENTIAL IMPACT**
14                                        **OF _METLIFE v. GLENN_ DECISION**
    KAISER PERMANENTE FLEXIBLE
15  BENEFITS PLAN,
                                          **DATE:  August 28, 2008**
16        Defendant.                      **TIME:  2:30 P.M.**
                                          **COURTROOM:  6**
17                                        **JUDGE: HON. VAUGHN R. WALKER**

18

19

20

21

22

23

24

25

26

27

28
                                                    CASE NO. C 07-03853 (VRW)
                        DEFENDANT'S BRIEF RE _METLIFE V. GLENN_

1    **I.    INTRODUCTION**

2        The Court has requested that the parties brief the potential impact in this action of the

3    Supreme Court's recent decision in *Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. __, 128 S.Ct.

4    2343 (2008), regarding conflicts of interest in cases where a benefit claim is decided by a

5    fiduciary whose financial interest could be affected by the decision. Defendant Kaiser

6    Permanente Flexible Benefits Plan ("Plan") submits the following assessment of *Glenn*. In

7    context, the issue arises here because the long term disability ("LTD") Plan benefits sought by

8    plaintiff Donald Gracey are insured by a contract of group LTD insurance between Kaiser

9    Foundation Health Plan, Inc. ("KFHP) and Metropolitan Life Insurance Company ("MetLife"),

10   which also is the claim administrator for LTD benefits. MetLife's status as both insurer and

11   claim administrator results in a structural conflict of interest.

12       In response to the Court's query as to what impact *Glenn* should have upon this Court's

13   review of the claim decision in issue, the Plan submits that *Glenn* has no substantial impact. The

14   law and the appropriate analysis of plaintiff's claim are as set forth in the Plan's motion papers,

15   previously submitted, and require judgment in favor of the Plan and against plaintiff.[1]

16   **II.    DISCUSSION**

17       Plaintiff Donald Gracey was a Project Manager for KFHP. The administrative record,

18   discussed in detail in the Plan's moving papers, shows that he had a coronary bypass in 2000, and

19   some sporadic episodes of angina thereafter. In mid-January 2006, he was briefly hospitalized

20   for chest pain, but his test results were essentially normal. In opposition to the Plan's motion for

21   summary judgment, plaintiff argued that MetLife, in adjudicating his claim, had ignored stress as

22   an allegedly disabling condition. Plaintiff further argued that MetLife's determination should not

23   be afforded any discretion and/or that its decision on his claim was an abuse of discretion.

24       Following the hearing on MetLife's motion, plaintiff served discovery seeking the

25   funding agreement between MetLife and KFHP, which the Plan previously had explained has no

26   bearing on his claim. Nevertheless, the Plan has provided that document (which, together with

27   _____

[1] The Plan will not burden the Court with lengthy repetition of its previously filed papers, but

28   will merely allude to certain issues discussed there.

1  plan documents previously produced as the Plan's initial disclosures, constitute the contract

2  between MetLife and KFHP).[2]  As such, plaintiff's continuing argument that the Plan did not

3  grant discretion to MetLife with regard to the decision in issue must be rejected. Under *Glenn*, as

4  well as under *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955 (9th Cir. 2006), whether as

5  previously applied or as implicitly modified by *Glenn*,[3] full discretion must be afforded to

6  MetLife's adjudication of the claim.

7        In *Glenn*, the Supreme Court held that where, as here, a plan fiduciary with discretionary

8  authority both determines eligibility for benefits and also pays claims, it is operating under a

9  conflict of interest. *Id.*, slip op. at 1-2. However, *Glenn* further held that this conflict is merely

10  one factor, among many, that a reviewing court should consider in determining whether a

11  fiduciary abused its discretion. *Id.*, slip op. at 7-9. The conflict factor is no more important to

12  that analysis than is any other factor. *Id.*, slip op. at 10. Indeed the Court specifically cautioned

13  against a narrow focus on the evaluator/payor conflict. *Id.*, slip op. at 10-11. In addition, *Glenn*

14  reaffirmed that a reviewing court must apply an abuse of discretion standard of review where, as

15  here, the plan documents grant discretionary authority to the claim administrator to determine

16  benefit eligibility. *Id.*, slip op. at 1-13. To the extent that earlier cases applied a less deferential

17  standard of review when there was a conflict (*e.g.*, a standard of "heightened scrutiny," or a

18  "sliding scale"), they no longer are valid as statements of the applicable law.

19        To the extent that plaintiff may argue that *Glenn* represents a change in the law, any such

20  change is not helpful to his position – as discussed below, the *Glenn* Court expressly rejected the

21  creation of special evidentiary standards or procedures where an ERISA-regulated plan grants

22  discretion to a claim fiduciary. Similarly, any argument that a structural conflict is a "tiebreaker"

23

24  [2] The contract (without the certificates that apply only to other groups) has been produced as
ADMIN 975-86, and is attached hereto as Exhibit A for the Court's review. It includes an
25  exhibit list of certificates for various employee groups (ADMIN 983-84) as of the date of policy
issuance; the relevant iteration of the certificate form applicable to plaintiff is ADMIN 14-50; it
26  was previously produced and provided to the Court (*see also* ADMIN 13, listing MetLife
contract 95910, *cf.* ADMIN 16, showing policy 95910, and *cf.* ADMIN 975 (policy 95910)).

27  [3] As noted below, *Glenn* adopts a "combination-of-factors" test rather than "heightened
28  scrutiny," the test in *Abatie*, when there is actual impact of the conflict upon the claim decision.

1    and therefore should tip the balance in plaintiff's favor would be misplaced, both because that is
2    not the law under *Glenn* (which ruled that any factor, not specifically a conflict, could be a
3    tiebreaker in a close case), and because this is not a close case. As detailed in the Plan's briefs in
4    support of its motion, plaintiff's allegedly disabling medical condition had existed for many
5    years, with the same degree of severity, while he continued to work at his usual occupation
6    without abnormal test results or other indicia of medical limitations.[4]

7    **A.    The *Glenn* Decision**

8         This Court has directed the parties, in their supplemental briefs, to discuss *Glenn*. As set
9    out below, *Glenn* confirms that the pure arbitrary and capricious (*i.e.*, abuse of discretion)
10   standard of review applies to this Court's review of MetLife's claim determination. Because
11   there is substantial evidence in the administrative record supporting the decision, judgment
12   should be entered in favor of the Plan.

13        *Glenn* confirmed that where an ERISA-regulated plan confers discretionary authority on
14   a claim administrator, claim decisions are to be reviewed under the well-known and undiluted
15   abuse of discretion standard of review. *Id*. at 2350. The Supreme Court also provided guidance
16   to lower courts regarding the weight to be given to the "evaluator/payor conflict," emphasizing
17   that this is "but one factor among many that a reviewing judge must take into account" in
18   determining whether a particular decision was an abuse of discretion. *Id*. at 2351. *Glenn* makes
19   it clear that the evaluator/payor conflict is to receive no more weight than any other factor in the
20   administrative claim file. *Id*. Accordingly, as explained further below, *Glenn* rejected case law
21   (such as that which had developed in the Ninth Circuit, typified by *Abatie*) which applied
22   "heightened scrutiny" or *de novo* review to decisions of claim administrators, and instead
23   adopted the "combination-of-factors method" that had developed in the Sixth Circuit. *Id*.

24

25   [4] At the point he stopped working, plaintiff had not had any serious medical issues for well
     over a year. As the Plan's reply brief, in particular, demonstrates, plaintiff is impermissibly
26   seeking to have this Court reverse the claim determination on the basis of information that was
     deliberately withheld from MetLife (*see* Plan's reply brief, pp. 5-7, 12-13) and that would, if
27   admissible and determinative of his right to benefits – which the Plan disputes – limit the
28   benefits to 24 months.

-3-                         CASE NO. C 07-03853 (VRW)

1    In his opposition to the Plan's motion, plaintiff argued that under *Abatie*, this Court
2    should either review the claim decision *de novo* or apply heightened scrutiny to the decision,
3    diminishing the deference otherwise applicable to the decision in light of the structural conflict.
4    The Plan, in contrast, demonstrated that even if – contrary to fact and law – that were a correct
5    standard of review, nevertheless the Plan would be entitled to judgment in its favor because the
6    decision was fully supported by, and indeed compelled by, the administrative record.

7    Under *Glenn*, this Court now must decide the Plan's motion by considering the structural
8    conflict as merely one factor alongside the medical and other information in the file – all of
9    which point to the same result, for the reasons set forth in the Plan's summary judgment briefs.
10   *Glenn*, therefore, if anything requires that more deference – not less – be given to MetLife's
11   adjudication of plaintiff's claim, because *Glenn* does not permit heightened scrutiny or decreased
12   deference, if a plan grants discretion to the claim fiduciary. As the *Glenn* Court stated, "We do
13   not believe that *Firestone*'s statement implies a change in the standard of review, say, from
14   deferential to *de novo* review." *Glenn, supra*, at 2350 (emphasis original). Nor does *Glenn* allow

15             courts to create special burden-of-proof rules, or other special
16             procedural or evidentiary rules, focused narrowly upon the
               evaluator/payor conflict. In principle, as we have said, conflicts are
17             but one factor among many that a reviewing judge must take into
               account.
18

19   *Id*. at 2351.

20   The administrative law case cited with approval in *Glenn* (*id*. at 2351) also shows that
21   even after *Glenn*, MetLife's claim decision is entitled to deference, and the Plan's motion for
22   summary judgment should be granted. *Universal Camera Corp. v. NLRB*, 340 U.S. 474 (1951),
23   required a reviewing court to set aside an agency ruling only if it was based on findings which are
24   "unsupported by substantial evidence," and "In making the foregoing determinations the court
25   shall review the whole record." *Id*. at 482 n.15. The *Universal* Court also held, "Nor does it
26   mean that . . . a court may displace the [fiduciary]'s choice between two fairly conflicting views,
27   even though the court would justifiably have made a different choice had the matter been before
28   it *de novo*." *Id.* at 488. In *Universal* it was noted that some courts, in applying an abuse of

-4-                                                    CASE NO. C 07-03853 (VRW)

1   discretion standard, had looked only at the evidence that supported the agency decision, while

2   ignoring contrary evidence, but that the entire record must be considered. *Id.* at 481. This is not

3   new; the Ninth Circuit has long acknowledged that an abuse of discretion review requires courts

4   to review the entire administrative claim file to see if substantial evidence supports the decision.

5   *See, e.g., Madden v. ITT Long Term Disability Plan for Salaried Employees*, 914 F.2d 1279,

6   1285 (9th Cir. 1990).

7   **B.    Application of the *Glenn* Decision**

8          The Plan assumes that plaintiff will continue to argue that MetLife's adjudication of his

9   claim is entitled to little or no deference, and will assert that *Glenn* supports him in that regard.

10  Such an argument will be contrary to the standards enunciated in *Glenn*, which make it clear that

11  when a plan grants discretion to the claim administrator,[5] decisions are reviewed for abuse of

12  discretion and any structural conflict is merely one among many factors that the reviewing court

13  will consider in making the determination of whether there was an abuse of discretion.

14         The Plan's motion shows (1) MetLife is the Plan's claim administrator for LTD benefits,

15  (2) MetLife carries out its duties under a grant of discretion and authority to make claim

16  determinations, and (3) MetLife did not abuse its discretion. MetLife adjudicated plaintiff's

17  claim only after thorough reviews of the relevant records, including multiple attempts to discuss

18  the case with his treating doctor, whose records did not substantiate the asserted limitations. In

19  all of the circumstances – including, among other factors, the structural conflict – that decision

20  was not an abuse of discretion, and should be sustained. Plaintiff's contention that MetLife

21  supposedly did not consider the asserted impact of stress, and thus abused its discretion, is

22  wrong; MetLife did consider the point, but found it was not sufficient to support the claim.

23         Following *Glenn*, the structural conflict does not trump the administrative record, but is

24  considered along with the administrative record, under a straightforward abuse of discretion

25  review without special procedural or evidentiary rules. The Plan's prior filings in connection

26  with its summary judgment motion spell out in detail the content of the administrative record,

27  _____

28  [5] The Plan has shown, from multiple sources, that its claim administrator is, indeed, granted discretion with regard to the decision being challenged here. *See* Plan's reply brief, pp. 8-11.

1  including the record as it specifically relates to stress. The stressors reported in the medical
2  records, to the extent that they are job related at all, cannot reasonably be read to support the
3  proposition that he could not do his occupation for "any employer." There was no attempt by
4  plaintiff to support his claim with such evidence, although the Plan's definition of "disability" is
5  not specific to the claimant's job, and it was his obligation to support his claim and provide
6  necessary documentation. *See Jordan v. Northrop Grumman Corp. Welfare Benefit Plan*,, 63 F.
7  Supp. 2d 1145, 1157 (C.D. Cal. 1999), *aff'd*, 370 F.3d 869 (9th Cir. 2004).

8  Applying *Glenn*, the Eighth Circuit observed that "the existence of a conflict did not lead
9  the [Supreme] Court to announce a change in the standard of review. We are to review an
10 administrator's discretionary benefit determination for abuse of discretion." *Wakkinen v. Unum*
11 *Life Ins. Co.*, 2008 U.S. App. LEXIS 14208, *16 (8th Cir. 2008). The Eighth Circuit went on to
12 explain that the requisite judicial standard of review under *Glenn* required that it "examine the
13 evidence that was before the administrator when the decision was made, and . . . determine
14 whether a reasonable person could have – not would have – reached a similar decision." *Id*. at
15 *21 (citations omitted; emphasis added).

16 Under *Glenn*, therefore, this Court will consider many different factors – no one of which
17 will be controlling – in determining whether it was an abuse of discretion for MetLife to find that
18 plaintiff had not substantiated a claim for disability benefits under the Plan. When those factors
19 are weighed together, the inescapable conclusion is that the determination of plaintiff's claim
20 was not an abuse of discretion. Along with the factor consisting of the structural conflict, this
21 Court also will consider the following factors:

22     1.     Plaintiff's treating doctor, Dr. Hlavac, was supportive of plaintiff's request
23     for disability status (*see* ADMIN 237), and offered "stress" as his rationale despite the
24     fact that plaintiff's medical records did not establish a current disability, given that he had
25     experienced no serious angina problems for years (and was working during that same
26     time), and had unremarkable cardiac test results for years (also while working).

27     2.     Plaintiff's belated emphasis on "stress" issues (in opposition to the Plan's
28     motion for summary judgment) is undercut by the administrative record. His premise is

-6-                                          CASE NO. C 07-03853 (VRW)

1    that occupational stress caused increased cardiac problems that disabled him, and that he

2    therefore cannot work in his occupation.  Even if there was a sufficiently close connection

3    between stress and plaintiff's documented medical conditions to warrant ceasing work

4    entirely – which is not established by the record, as shown in the Plan's prior filings – his

5    stressors were not related to his occupation,[6] but to his personal relationships with his

6    family, coworkers at KFHP, and superiors at KFHP.[7]

7         3.      Plaintiff's psychiatric records do not establish inability to work at his

8    occupation.  Indeed, the Kaiser Department of Mental Health specifically informed

9    MetLife, in response to MetLife's attempt to follow up on the possibility of a psychiatric

10   disability, that plaintiff was not psychiatrically disabled.  *See* Plan's reply, pp. 2-6.[8]

11        4.      MetLife's reason for denying the claim was, as explained in its letter of

12   July 27, 2006, the fact that plaintiff's records did not substantiate current cardiac

13   problems (as distinct from historical ones).  The letter also discussed that a psychiatric

14   clinical specialist had reviewed the file regarding psychiatric issues, and that Kaiser DMH

15   had informed MetLife that plaintiff was not disabled by psychiatric issues.  Due to lack of

16   medical or psychiatric evidence of functional limitations, plaintiff's claim for Plan

17   benefits was denied.

18

19   [6] On August 7, 2006, Dr. Hlavac wrote a conclusory note stating that plaintiff was "unable to
     work as a project manager for any company or corporation due to stress and the affect [sic] that it
20   has on his chronic conditions."  (ADMIN 723.)  Dr. Hlavac pointed to no instances in which that
     had occurred, however, and offered no clinical basis for his statement.

21   [7] As discussed in the Plan's motion (MSJ p. 3), one's "own occupation" under the Plan does
22   not mean the job one holds, but rather the same occupation performed *for any local employer*.  In
     other words, clashes with supervisors and coemployees at plaintiff's specific Kaiser job are not
23   determinative of whether he could perform his "own occupation," but for a different employer.

24   [8] Thus, it was DMH – plaintiff's psychiatric treaters – that directed the inquiry regarding
     plaintiff's claimed disability away from psychiatric factors, such as stress and depression, and
25   toward physical issues.  In opposition to the Plan's motion, plaintiff offered evidence related to a
     Social Security award – issued long after his claim under the Plan had been decided – which
26   made reference to psychiatric treatments and to psychiatric health professionals, none of which
     ever was disclosed to MetLife (as evidenced by the absence of any such information from the
27   administrative record).  *See* discussion in Plan's reply, pp. 5-7.  The SSDI award, and the related
28   opinion, have no bearing on whether MetLife's decision was an abuse of discretion.  *Id.*

1          5.      Following the denial plaintiff submitted further records, which were

2    reviewed and evaluated. These records reflected a brief hospital admission on January

3    13, 2006, and an emergency room visit on January 16, 2006, in which plaintiff reported

4    chest pain, but his test results and related workup were normal. On September 6, 2006,

5    therefore, MetLife again wrote to plaintiff, explaining that the additional records did not

6    show a serious functional limitation. (ADMIN 346-47.)

7          6.      On appeal, as required by ERISA regulations, MetLife referred the file to a

8    company that provides referral services for independent medical review by physicians

9    with the appropriate areas of medical specialization. The subsequent independent

10   reviews by Drs. Patel and Jares are discussed in depth in the Plan's moving papers and

11   reply brief. Those reviews (which were detailed and specific) noted that plaintiff's

12   cardiac problems had been stable and under control since at least a year before he stopped

13   working, despite the stress he reportedly was experiencing while working. Plaintiff's

14   argument that MetLife artificially restricted the scope of the reviewing physicians'

15   analysis is false; see discussion in the Plan's reply brief, pp. 7-8.[9]

16         The Ninth Circuit recently addressed *Glenn*, finding that an ERISA claim fiduciary

17   abuses its discretion only if it (1) renders a decision without explanation, (2) construes provisions

18   of the plan in a way that conflicts with the plain language of the plan, or (3) relies on clearly

19   erroneous findings of fact. *See Wells v. Reliance Std. Life Ins. Co.*, 2008 U.S. App. LEXIS

20   14430 (9th Cir. July 3, 2008). This matter cannot be said to raise either of the first two factors in

21   *Wells*. Regarding the third factor, *Wells* cited to *Boyd v. Bert Bell/Pete Rozelle NFL Players*

22   *Retirement Plan*, 410 F.3d 1173, 1178 (9th Cir. 2005) and *Snow v. Standard Insurance Co.*, 87

23   F.3d 327, 332 (9th Cir. 1996), explaining that a plan administrator's factual determinations are

24   ──────────────
     [9] Indeed, MetLife's instructions to the reviewing physicians selected by the referral service
25   that the physicians were to answer the following question: "Does the medical information
     support functional limitations for beyond 7/17/06 (job is light)? Functional limitations include
26   any reduction in ability to work full time." (ADMIN 147 [emphasis added].) Moreover, MetLife
     included in its referral an express instruction to "please call" the treating doctor, and provided his
27   telephone number – and the reviewing doctors reported multiple attempts to do so, to which
28   plaintiff's doctor did not respond.

─────────────────────────────────────────────────────────────────
                                        -8-                    CASE NO. C 07-03853 (VRW)

1   not clearly erroneous "where there is substantial evidence to support the decision, that is, where

2   there is 'relevant evidence [that] reasonable minds might accept as adequate to support a

3   conclusion even if it is possible to draw two inconsistent conclusions from the evidence.'"

4       Even under *Abatie*'s "heightened scrutiny" standard, and the more so under *Glenn*'s

5   "totality of factors" standard, the factors enumerated above point inexorably to the conclusion

6   that MetLife did not abuse its discretion in denying plaintiff's claim for Plan benefits. The

7   decision was the product of an extensive exchange of information with plaintiff and his treating

8   doctor, and followed (unsuccessful) attempts to discuss the case directly with the treating doctor.

9       Here, it was only after a lengthy and ongoing communications between and among

10  MetLife, plaintiff's treating doctors, and the independent consulting doctors, that the claim was

11  denied on appeal. Ultimately, the Plan and its claim fiduciary were entitled to credit the medical

12  opinions of a board certified internist with a specialty in cardiology, and a board certified

13  neurologist, each of whom reviewed the medical records and separately opined that plaintiff's

14  medical issues did not limit his functionality such as to make him incapable of performing his

15  occupation. The specialists fully considered the treating doctors' comments, and indeed tried to

16  speak with them, in reaching their ultimate opinions regarding plaintiff's level of functional

17  impairment. ERISA regulations *require such reviews*. *See* 29 C.F.R. § 2560-503-1(h)(3)(iii),

18  (4). It is axiomatic that, having obtained the legally required reviews, MetLife was entitled to

19  credit them.

20      Moreover, it was at all times plaintiff's burden to support his claim. *See Jordan*, *supra*.

21  Plaintiff's argument to this Court has been, and the Plan assumes it will continue to be, that

22  MetLife was required to accept his treating physician's conclusory and unsupported assertion of

23  disability. That is contrary to the law, as articulated by the Supreme Court: "We hold that plan

24  administrators are not obligated to accord special deference to the opinions of treating

25  physicians." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 825, 834 (2003) [emphasis

26  added]. *See also Hunt v. Metropolitan Life Ins. Co.*, 425 F. 3d 489, 490-91 (8th Cir. 2005)

27  [treating physician opined plaintiff was disabled; MetLife "was nevertheless entitled to rely on

28  the opinions of two reviewing physicians who gave contrary opinions" and "did not abuse its

1    discretion in denying Hunt LTD benefits"].

2        Similarly, *Glenn*'s discussion of the potential impact of a Social Security award has no

3    relevance here because: (1) the award did not exist when plaintiff's claim was decided, so there

4    was no occasion for MetLife to agree or disagree with it (much less to explain any disagreement),

5    and (2) the award apparently was based upon extensive psychiatric information that plaintiff

6    chose to withheld from MetLife, presumably because of the potential impact of the Plan's 24-

7    month limit on benefits for psychiatric disorders. Having withheld such evidence at the claim

8    and appeal stage, he cannot rationally expect this Court to rule that it was an abuse of discretion

9    for MetLife to fail to award benefits, and require it to pay benefits now, on the basis of such

10    withheld evidence. *See Taft v. Equitable Life Assur. Society*, 9 F.3d 1469, 1472 (9th Cir. 1993).

11    **III.    CONCLUSION**

12        The Supreme Court's *Glenn* ruling does not support plaintiff's attempt to prove that the

13    denial of his claim was an abuse of discretion. The Plan demonstrated in its previous briefs that

14    its motion should be granted under the *Abatie* standard. Under *Glenn*, however, the Plan's

15    argument is even stronger – there no longer are special rules for evaluation of a structural conflict

16    of interest; rather, the structural conflict is merely one factor to be considered by this Court, and

17    is not to any special weight.

18        In light of the full record, including the many factors that *Glenn* directs be considered

19    along with the structural conflict, the Plan's motion should be granted. Consequently, the Plan

20    requests that the Court grant its motion for summary judgment and enter judgment in its favor.

21

22    Dated: August 14, 2008                SEDGWICK, DETERT, MORAN & ARNOLD LLP

23

24                                By /s/ Rebecca A. Hull
                                    Rebecca A. Hull
25                                  Attorneys for Defendant
                                    KAISER PERMANENTE FLEXIBLE BENEFITS
26                                  PLAN

27

28

                                        -10-                CASE NO. C 07-03853 (VRW)

# EXHIBIT A

# MetLife®

# Metropolitan Life Insurance Company

## A Mutual Company Incorporated in New York State

**Employer:**          Kaiser Foundation Health Plan, Inc.

**Group Policy No.:**   95910-G

**Date of Issue:**     January 1, 1998

In return for the payment of the premiums when they fall due

### Metropolitan Life Insurance Company
(Herein Called Metropolitan)

will pay the insurance and other benefits which are described in the Exhibits, subject to the terms and provisions of this Policy. The Schedule of Exhibits sets forth each Exhibit which is to be attached to and made a part of this Policy and to whom each such Exhibit applies.

Louis J. Ragusa
Vice-President and Secretary

Robert H. Benmosche
Chairman, President and Chief Executive Officer

**Premiums Are To Be Paid On A Monthly Basis**

The Dividend, If Any, Is To Be Determined Each Year.

Form G.2130-S

ADMIN 0975

## TABLE OF CONTENTS

Page

Section 1.    DEFINITIONS.........................................................................................................................1

Section 2.    ELIGIBILITY AND EFFECTIVE DATES OF INSURANCE...................................................1

Section 3.    CONTRIBUTIONS.................................................................................................................1

Section 4.    CESSATION OF INSURANCE ............................................................................................1

Section 5.    SCHEDULE OF INSURANCE..............................................................................................1

Section 6.    PREMIUM RATES.................................................................................................................2
              INITIAL RATE...........................................................................................................2
              COMPUTATION OF PREMIUM...............................................................................2
              PREMIUM ADJUSTMENTS......................................................................................2
              CHANGES IN RATES ..............................................................................................2

Section 7.    PREMIUM DUE DATES .......................................................................................................2

Section 8.    PAYMENT OF PREMIUMS..................................................................................................2

Section 9.    GRACE PERIOD ..................................................................................................................3

Section 10.   CERTIFICATES ...................................................................................................................3

Section 11.   ASSIGNMENT......................................................................................................................3

Section 12.   RECORDS TO BE MAINTAINED ........................................................................................3

Section 13.   INFORMATION TO BE FURNISHED ..................................................................................4

Section 14.   ENTIRE CONTRACT ...........................................................................................................4

Section 15.   INCONTESTABILITY; STATEMENTS.................................................................................4

Section 16.   MISSTATEMENT OF AGE...................................................................................................4

Section 17.   CHANGES IN THE POLICY.................................................................................................4

Section 18.   PARTICIPATION ..................................................................................................................5

Section 19.   DIVIDENDS..........................................................................................................................5

Section 20.   DISCONTINUANCE OF THE POLICY.................................................................................5

Section 21.   ADDITIONAL PROVISIONS ................................................................................................5

SCHEDULE OF PREMIUMS......................................................................................................................6

SCHEDULE OF EXHIBITS ........................................................................................................................7

**ADMIN 0976**

**Section 1.    DEFINITIONS**

The term **"Employee"** means any person defined as such in an Exhibit listed in the Schedule of Exhibits.

The term **"Personal Insurance"** means insurance on account of an Employee.

The term **"Personal Insurance Eligibility Date"** means the date an Employee is eligible for Personal Insurance.

The term **"Premium Due Date"** means the first day of each month after the Date of Issue.

The term **"Policy Period"** means a period beginning with any January 1 and ending with the next December 31.

The term **"Non-Contributory Insurance"**  means insurance for which the Employee does not have to pay the cost.

The term **"Contributory Insurance"** means insurance for which the Employee has to pay at least a portion of the cost.


**Section 2.    ELIGIBILITY AND EFFECTIVE DATES OF INSURANCE**

The provisions regarding eligibility and effective dates of insurance with respect to any Employee are set forth in the Exhibit which applies to such Employee.


**Section 3.    CONTRIBUTIONS**

The Employer does not require Employees to contribute to the cost of the Non-Contributory Insurance.

The maximum amounts that the Employer may require an Employee to contribute to the cost of the Contributory Insurance shall not exceed the premium charged for the amounts of such insurance.


**Section 4.    CESSATION OF INSURANCE**

An Employee's insurance will cease as set forth in the Exhibit which applies to the Employee. The insurance on all Employees will cease on the date this Policy is discontinued.


**Section 5.    SCHEDULE OF INSURANCE**

The amounts of insurance which are in force on account of an Employee will be as set forth in the Exhibit which applies to such Employee.

## Section 6.    PREMIUM RATES

INITIAL RATES

The initial premium rates are set forth in the Schedule of Premiums.

COMPUTATION OF PREMIUM

The premium is the sum of the premiums for the total amounts of all of the types of insurance then in force, subject to premium adjustments, if any. Such premium is determined on the basis of the premium rates which are then in effect.

In the computation of the premium which is due on any Premium Due Date, Metropolitan may use any equitable method which is agreeable to both the Employer and Metropolitan.

PREMIUM ADJUSTMENTS

A premium adjustment which involves a credit to the Employer will be limited to the period of twelve months before the date of the receipt by Metropolitan of evidence that such an adjustment should be made.

CHANGES IN RATES

Metropolitan may change any or all of the premium rates if there is a change in the terms of this Policy. Metropolitan may also change any or all of the premium rates on any Premium Due Date, provided Metropolitan has given the Employer written notice of such change thirty-one days prior to the date such change is to become effective.

## Section 7.    PREMIUM DUE DATES

The initial premium is due on the Date of Issue. All other premiums will be due on each Premium Due Date.

The premium payment must be paid on a monthly basis unless the Employer requests in writing a change in the mode of premium payments to an annual, semi-annual or quarterly basis.

Any change in the mode of premium payments must be approved by Metropolitan.

## Section 8.    PAYMENT OF PREMIUMS

All premiums which fall due, with the adjustments, if any, will be payable by the Employer on or before their respective due dates. All such premiums are to be paid at the Home Office of Metropolitan (or at such office as Metropolitan may designate for that purpose) or to an authorized representative of Metropolitan. The payment of a premium will not maintain the insurance in force beyond the day before the date the next premium is due, except as set forth in Section 9.

Form G.2130-S                                           2

ADMIN 0978

**Section 9.   GRACE PERIOD**

A grace period of thirty-one days will be granted by Metropolitan for the payment of any premium which falls due after the Date of Issue.

During the grace period this Policy will continue to be in force.

If the Employer fails to pay the premium within the grace period, Metropolitan will discontinue this Policy on the last day of the grace period.

However, if notice in writing is given by the Employer to Metropolitan prior to the end of the grace period that this Policy is to be discontinued before the end of the grace period, this Policy shall be discontinued on the later of (a) the date of receipt of such notice by Metropolitan or (b) the date specified in the notice for such discontinuance.

In any case, the Employer will be liable to Metropolitan for the payment of the pro-rata premium which accrues for the period the Policy is in force.

**Section 10.   CERTIFICATES**

Metropolitan will furnish certificates to the Employer for delivery to each Employee who is insured. The certificate will state the insurance protection to which the Employee is entitled and to whom the benefits will be paid. The certificate will set forth the provisions of this Policy which mainly affect the Employee. The word "certificate" includes riders and supplements to the certificate, if any.

**Section 11.   ASSIGNMENT**

An Employee's certificate may not be assigned. The Employee's insurance and benefits may not be assigned prior to a loss.

**Section 12.   RECORDS TO BE MAINTAINED**

Records which relate to the insurance under this Policy will be maintained. Such records will include the following:

a.   The names and ages of all Employees who are insured.
b.   The amounts of insurance in force on each Employee.
c.   The effective date of each Employee's insurance.
d.   The effective date of any change in an amount of an Employee's insurance.

Such records will be maintained by Metropolitan; the records may, with the consent of Metropolitan, be maintained by the Employer.

ADMIN 0979

## Section 13.    INFORMATION TO BE FURNISHED

The Employer and the Employees will furnish to Metropolitan all of the information which Metropolitan may reasonably require with regard to the matters which relate to the insurance. The Employer will allow Metropolitan to inspect all documents, books and records of the Employer which relate to the insurance or to the premiums.

## Section 14.    ENTIRE CONTRACT

This Policy and the application of the Employer constitute the entire contract between the parties. A copy of the application is attached to this Policy.

## Section 15.    INCONTESTABILITY; STATEMENTS

Any statement made by the Employer or by an Employee will be deemed a representation and not a warranty. No such statement will avoid the insurance or reduce the benefits under this Policy or be used in defense to a claim under this Policy unless it is contained in a written application. No such statement of the Employer will be used at all after the Policy has been in force for two years from its Date of Issue.

No such statement made by an Employee which relates to insurability will be used in contesting the validity of the insurance with respect to which such statement was made or to reduce the benefits unless the conditions listed in items (a) and (b) below have been met.

- **a.** The statement must be contained in a written application which has been signed by the Employee.

- **b.** A copy of the application has been furnished to the Employee or to the Employee's beneficiary.

No such statement of the Employee will be used at all after such insurance has been in force prior to the contest for a period of two years during the lifetime of the person to whom the statement applies.

## Section 16.    MISSTATEMENT OF AGE

In the case of the misstatement of the age of an Employee, an adjustment of the premium will be made, if appropriate.

If an amount of insurance is based on the age of the Employee, such amount will be adjusted to the amount to which such Employee would have been entitled at the Employee's correct age. The adjustment of the premium will be based on the adjusted amount of the Employee's insurance.

## Section 17.    CHANGES IN THE POLICY

No change in this Policy will be valid unless it is approved by an authorized officer of Metropolitan. Each such change must be evidenced by an amendment signed by both the Employer and by Metropolitan or by an endorsement signed by Metropolitan.

No agent may make a change in this Policy or waive any of its provisions.

**Section 18.   PARTICIPATION**

This Policy is a participating contract.

**Section 19.   DIVIDENDS**

Each year Metropolitan will determine the dividend, if any, to which this Policy may be entitled. Such determination will be within the sole discretion of Metropolitan's Board of Directors.

However, in view of the manner in which Metropolitan has determined premium rates, Metropolitan does not anticipate that this Policy will be entitled to any dividend.

In any case, if the Employees' total contributions to the cost of the insurance are in excess of the net cost of the insurance, the Employer must distribute or apply the amount of such excess for the sole benefit of the Employees.

**Section 20.   DISCONTINUANCE OF THE POLICY**

Metropolitan will have the right to discontinue this Policy if less than 75% of the eligible Employees are insured for Contributory Insurance.

Metropolitan will also have such right if less than 10 Employees are insured. Such right may be exercised by Metropolitan only on the last day of the first Policy Period or on the day before any Premium Due Date which occurs after the last day of the first Policy Period. Notice, in writing, that this Policy is to be discontinued must be given to the Employer by Metropolitan. The notice must be given at least thirty-one days prior to the date this Policy is to be discontinued.

**Section 21.   ADDITIONAL PROVISIONS**

This Policy is not in lieu of and does not affect any requirement for coverage by workers' compensation insurance.

MISSTATEMENT OR CLERICAL ERROR

If relevant facts about an Employee were not accurate:

   **a.**   a fair adjustment of premium will be made; and
   **b.**   the true facts will decide whether and in what amount insurance is valid under this Policy.

A clerical error will not void insurance which should be in force. Nor will it continue insurance which should have ended. When an error is found, Metropolitan will make a fair adjustment in the premium.

**ADMIN 0981**

## SCHEDULE OF PREMIUMS

The initial monthly premium rates for the insurance specified below are as follows:

Long Term Disability Benefits: - $x.xx per $100 of Total Insured Payroll.

**Total Insured Payroll** means the sum of each Employee's Basic Monthly Earnings up to a maximum of $21,429 per Employee.

## SCHEDULE OF EXHIBITS

| Exhibit No. | Form | Applicable To |
| --- | --- | --- |
| 1 | G.23000 Series with any numerical and alphabetical suffix as shown in the Exhibit | All Physician Assistants in Southern California (Plan G01) |
| 2 | G.23000 Series with any numerical and alphabetical suffix as shown in the Exhibit | All California South Employees classified as: C.S.C #30; Fontana Riverside Technicians; Local 399; Local 501; Local 7600; Non-union Hourly; Medical Technicians; Researchers; and U.F.C.W. Medical (Plan G06) |
| 3 | G.23000 Series with any numerical and alphabetical suffix as shown in the Exhibit | All Local 535 in the California South Region (Plan G82) |
| 4 | G.23000 Series with any numerical and alphabetical suffix as shown in the Exhibit | All California South Region Employees classified as: Exempt Salaried; Kaiser Permanente Nurse Anesthetists Association; and Executive Confidential (Plan GA6) |
| 5 | G.23000 Series with any numerical and alphabetical suffix as shown in the Exhibit | All Dentists in the Northwest Region (Plan GA3) |
| 6 | G.23000 Series with any numerical and alphabetical suffix as shown in the Exhibit | All Physicians, Administrative Staff and Optometrists in the Hawaii Region (Plan 995) |
| 7 | G.23000 Series with any numerical and alphabetical suffix as shown in the Exhibit | All Physicians in the Ohio Region(Plan 995) |
| 8 | G.23000 Series with any numerical and alphabetical suffix as shown in the Exhibit | All Local 7 and Local 105 Employees in the Rocky Mountain Colorado Region (Plan G03) |

**ADMIN 0983**

## SCHEDULE OF EXHIBITS (Cont'd)

| Exhibit No. | Form | Applicable To |
| --- | --- | --- |
| 9 | G.23000 Series with any numerical and alphabetical suffix as shown in the Exhibit | All Physicians in the Rocky Mountain Kansas City Region (Plan G07) |
| 10 | G.23000 Series with any numerical and alphabetical suffix as shown in the Exhibit | All Employees classified as follows: Hawaii Region; Exempt Salaried and Executive Confidential; Mid-Atlantic Region; Allied Health, Local 2, Local 27, Local 99 and Local 400; California North Region; Local 535; Texas Region; C.S.C.; Northwest Region; Executive Confidential; Kansas City Medical Group; Exempt Salaried and Non-exempt Salaried (Plan G94) |
| 11 | G.23000 Series with any numerical and alphabetical suffix as shown in the Exhibit | All Physicians in the Northeast Region (Plan 995) |
| 12 | G.23000 Series with any numerical and alphabetical suffix as shown in the Exhibit | All Physicians in the Northeast Region (Plan 996) |

**ADMIN 0984**

## NOTICES TO THE HOLDER OF THIS POLICY

**VOTING PRIVILEGE.** An election of Directors is held in New York, New York, on the second Tuesday of April in each year. If this Policy has been in force for at least one year and while it remains in force, the holder of this Policy will have a right to vote. For the details as to how to vote, apply to the Secretary at the Home Office.

**NOMINATIONS.** The New York Insurance Law requires the Board of Directors to nominate candidates described as the "Administration Ticket". Other nominations may be made by groups of policyholders. All such nominations must be made not less than five months prior to the election.

### METROPOLITAN LIFE INSURANCE COMPANY

**HOME OFFICE**
**One Madison Avenue**
**New York, New York**
**10010**

Countersigned _____ _____ _____

Date

By _____ _____

Licensed in California

Agent's License Number in California _____ _____ _____

Form G.2130-S

Policyholder Name:     Kaiser Foundation Health Plan, Inc.
Policyholder Number: 95910
Policyholder Situs:     California

ADMIN 0985

## Metropolitan Life Insurance Company
## (Herein called Metropolitan)
## Application for Group Insurance

Kaiser Foundation Health Plan, Inc.

**(Applicant)**

Any Group Policy issued upon this application will be delivered in _California_. Such Policy will be considered a _California_ contract. The terms of such Policy will be construed in accordance with the laws of that jurisdiction.

## Types of Insurance Applied for:

|  | Employees Only | Employees and their Dependents |
|---|---|---|
| Long Term Disability Benefits | [ X ] | [ ] |
|  | [ ] | [ ] |
|  | [ ] | [ ] |
|  | [ ] | [ ] |
|  | [ ] | [ ] |

## Types of Financial Arrangements Requested:

| | |
|---|---|
| Excess Risk | [    ] |
| Excess Risk and Special Premium Account | [    ] |
| Retrospective Premium Determination | [    ] |

The premiums are to be paid on a __monthly__ basis. An advance payment of _____ is attached.

**It is agreed that:**

(a)   The conditions of eligibility, the amounts of the insurance and all of the terms and conditions under which the insurance is to be provided will be set forth in the Group Policy (or Policies) issued.

(b)   The Group Policy (or Policies) is to be issued only if all of the conditions listed in items (1) through (4) below are met.

   (1)   This application has been accepted by Metropolitan at its Home Office or at such office as may be designated by Metropolitan for that purpose.

   (2)   At least_10_ of the persons who are eligible on the date of issue are to be insured on that date.

   (3)   If the insured persons must contribute to the cost of any type of insurance, at least _75%_ of all persons who are eligible for each such type of insurance on the date of issue must make request, in writing, for each such type of insurance. Such requests must be made on or prior to the date of issue.

   (4)   Metropolitan has received an amount equal to the initial premium as estimated by Metropolitan.

Dated at _____ on _____

Kaiser Foundation Health Plan, Inc.
Applicant

By_____
Signature and Title

Witness

Form G.4980-1

ADMIN 0986